(156 App. Div. 414.)

PEOPLE v. GALBO.

(Supreme Court, Appellate Division, Fourth Department. April 30, 1913.)

1. HOMICIDE (§ 232*)—MURDER—PREMEDITATION—DELIBERATION—EVIDENCE.

Where the death of decedent resulted from decapitation, accomplished while he was unconscious from blows on the head, and the unconsciousness following the blows would be of short duration only, and the decapitation was performed with some degree of skill by a clean cut, there was evidence of a deliberate and premeditated design to effect his death, sufficient to support a conviction of murder.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. § 480; Dec. Dig. § 232.*]

2. HOMICIDE (§ 229*)—IDENTITY OF DECEDENT—EVIDENCE.

Where the district attorney and counsel for accused assumed that the inquiry made and evidence given relative to a body found related to the body of decedent, and a physician performing the autopsy on the body found testified that he performed the autopsy on the remains of decedent, and no question was made of the identity of the body found as that of decedent, and a witness testified without objection that he knew decedent and recognized the body found as that of decedent, a motion for acquittal for failure to prove that the body found was the body of decedent was properly denied.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. § 477; Dec. Dig. § 229.*]

3. HOMICIDE (§ 234*)—EVIDENCE—SUFFICIENCY.

Evidence *held* to sufficiently connect accused with the killing of decedent, so as to support a conviction of murder in the second degree.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 482–493; Dec. Dig. § 234.*]

4. HOMICIDE (§ 234*)—EVIDENCE—SUFFICIENCY.

That accused actually concealed the body of decedent, so mutilated as to indicate that decedent was murdered, is properly considered as evidence of accused's guilty participation in the murder, especially where he did not attempt to explain his attempted concealment, but denied that he had any connection with the transaction at any time.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 482–493; Dec. Dig. § 234.*]

5. HOMICIDE (§ 233*)—EVIDENCE—MOTIVE.

Though proof of motive for the murder of decedent is not essential to support a conviction, proof of motive furnishes corroboration, in a case depending on circumstantial evidence.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. § 481; Dec. Dig. § 233.*]

6. HOMICIDE (§ 166*)—EVIDENCE—MOTIVE.

Proof that decedent was a professional extortioner, and had been convicted of extortion, and that on the day preceding his murder he had

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

demanded money of the brother and partner of accused under circumstances indicating a covert threat of what would be done if the demand was not complied with, may be considered by the jury on the issue of motive.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 320–331; Dec. Dig. § 166.*]

Lambert and Kruse, JJ., dissenting.

Appeal from Trial Term, Monroe County.

Domenico Galbo was indicted for murder. From a judgment of conviction of murder in the second degree, and from an order denying a motion for new trial, made under Code Cr. Proc. § 465, on the ground that the court misdirected the jury in matters of law, and refused to instruct them as prescribed by section 420, and that the verdict of the jury was contrary to law and was clearly against the weight of the evidence, he appeals. Affirmed.

The defendant and his brother, Joseph Galbo, were jointly indicted for the murder of Francesco Manzella on the 29th day of October, 1911, at the city of Rochester, in the county of Monroe. The indictment charged that the defendants killed Manzella by severing his head from his body with a sharp instrument, weapon, and thing, the exact nature of which was to the grand jury unknown. Both defendants pleaded not guilty and demanded separate trials.

Argued before McLENNAN, P. J., and KRUSE, ROBSON, FOOTE, and LAMBERT, JJ.

Louis E. Fuller, of Rochester, for appellant.
John W. Barrett, Dist. Atty., of Webster, for the People.

ROBSON, J. About eight o'clock in the morning of October 30, 1911, a barrel, containing the mutilated body of Francesco Manzella, was discovered near the bottom of a ravine on the west side of a highway leading from Rochester to the village of Webster, known as the Webster Road. This barrel was not there at 3 o'clock on the preceding afternoon. The upper edge of this ravine is near the traveled part of the highway, and along the edge there was a substantial post and rail barrier. The side of the ravine slopes quite sharply downward from the highway to the west, and the declivity is thickly covered with a growth of bushes and the like. The conditions there existing appear to have been favorable for the concealment of such an object; and its speedy discovery after it was placed there was purely fortuitous. Examination of the body disclosed that it was completely dressed, except that there was no coat upon it. A hat and a raincoat were found in the barrel. The head had been entirely severed from the body, and the legs had been almost completely severed at a point above the middle of the thigh and drawn backward to the body, to which they were then bound by a rope. Examination of the head showed many bruises and cuts thereon, four of which were in the temporal region, there being two on each side of the head. There were also two slight bruises, designated as "brush burns," one on each hand. Except these two trifling injuries to the hands, the other bruises and cuts were on the head.

[1] The evidence of the physicians who performed the autopsy, which is not controverted in any way, is to the effect that all of these wounds upon the head and hands were inflicted before the decapitation, and the four in the temporal region were sufficient to produce unconsciousness, but would not cause death. Death resulted from decapitation, which, as the evidence indicates, must have been accomplished while the victim was unconscious from the blows on the head, which he had previously received. The evidence also indicates that the unconsciousness following the injuries to the head would be of short duration, and the jury may properly have found that the decapitation occurred within four or five minutes after Manzella had been beaten into unconsciousness, and that the blows and the decapitation were together the means and method used by the person or persons responsible for his death in effecting their purpose to kill him. The decapitation was performed with some degree of skill, by a single clean cut; the spine being severed at a joint of the vertebræ with the same instrument used in cutting the flesh. The place at which the cut was made seems to have been deliberately and carefully chosen; the operator having, as was indicated by a slight superficial cut on the neck, first placed the knife against the neck, and then lowered it nearly half an inch to a more favorable position for his purpose before beginning the cut which severed the head. The blows upon the head, it not appearing with what weapon they were inflicted, would not, in and of themselves, be sufficient to prove an intent or design to kill; but, followed immediately, as they apparently were, by the decapitation, no other reasonable conclusion can be reached than that there was an intent to kill, and the jury would have been further warranted in finding that the killing was with premeditation and deliberation. As was said by Ruger, J., in People v. Conroy, 97 N. Y. 62, 77:

"In capital as well as other cases it must be held that a person intends that which is the natural and necessary consequence of an act done by him, and unless the act was done under circumstances which preclude the existence of such intent, the jury had the right to find, from the result produced, an intention to effect it."

It would seem that the bare proof and description of the wounds which caused Manzella's death, nothing whatever appearing to explain or contradict the probable inference to be drawn therefrom, established beyond a reasonable doubt that the person or persons who inflicted them did so with the deliberate and premeditated design to effect his death. Commonwealth v. Best, 180 Mass. 492, 496, 62 N. E. 748.

[2] One of the grounds for reversal urged by appellant, not involving the decision of any question of fact presented on this appeal, may be here noticed. It is claimed that when the prosecution rested its case it had failed to prove that the body found in the barrel was the body of Francesco Manzella, with the killing of whom defendant was charged in the indictment. It is true that no direct proof by a witness who, in answer to a direct question whether he identified the body found in the barrel as that of Manzella, stated in so many words that he did, had up to that time been given. But it seems that the counsel for the defendant, as well as the district attorney, assumed

that the inquiry made and evidence given relative to the body found were to be understood and treated as relating to the body of Manzella. This clearly appears in many places in the evidence. When the witness White, he being one of the physicians who performed the autopsy on the body found in the ravine, was examined for the people, he testified as follows:

"I assisted in performing the autopsy on the remains of Francesco Manzella, and was assisted by Dr. Thomas T. Mooney, another coroner's physician. We made that autopsy on the 30th of October, and completed it on November 1st."

Asked, then, to state what he found, and what his conclusion was as to the cause of death, he was permitted in reply without objection to read his notes of the autopsy, beginning as follows:

"Coroner, Kleindienst. Coroner's Physicians, Mooney and White. Date, October 30, 1911. Age, about 25–30. Name, Francesco Manzella."

Mooney, the other physician, was thereafter called by the people, and without objection testified:

"I assisted Dr. White, of Honeoye Falls, in performing an autopsy on the remains of Manzella."

No question seems to have been made then, or at any other time, that either of these witnesses did not from personal knowledge identify the body as that of Manzella. From the testimony of these witnesses, as it appears in the record now before us, we must assume that they were testifying from personal knowledge. No attempt at any time was made on behalf of defendant to question the fact that the body the physicians referred to was that of Manzella; and after the close of defendant's evidence a witness was called by the people, when the case was again with it, who testified without objection that he knew Manzella and recognized the body found in the barrel as that of Manzella. Defendant's motion for acquittal, made upon the ground above stated, was properly denied. People v. Lagroppo, 90 App. Div. 219, 86 N. Y. Supp. 116, affirmed 179 N. Y. 126, 71 N. E. 737.

[3] The evidence by which it was sought to connect the defendant with the killing of Manzella is mostly circumstantial, and is largely directed to showing that he was actively concerned in the disposition and concealment of the body of the murdered man. Defendant and his brother, Joseph Galbo, were at the time in question, and for some time prior thereto had been, interested together in business as dealers in bananas, having for the purposes of their business a store near the public market in the city of Rochester. Joseph Galbo was married, and lived with his father-in-law, Joseph Ollis; but the defendant, Domenico, occupied as his abode a room directly over the store. Manzella, who is referred to in the record as a "Black-Hander," and who in the early spring preceding his death had completed service of a sentence in state prison for extortion, had been employed at some time during the summer in or near defendant's store. He had eaten in defendant's room on several occasions, and had on occasion slept there. He had also been employed by Ollis. There is little evidence as to Manzella's whereabouts for some weeks prior to

the few days immediately preceding his death, except that he seems to have visited a brother in Detroit, and again returned to Rochester. From some time in the morning of Saturday, October 28th, until the discovery of his body in the ravine on the morning of Monday, the 30th, the record is barren of evidence from any witness who testifies to the fact of seeing him, except one witness for the defendant, who testifies that he saw him in company with three men, whom he did not know, about half past 1 in the afternoon of Sunday, the 29th. The jury may well have viewed the evidence of this witness with suspicion.

At what time Manzella was killed does not distinctly appear. It can only be approximately determined, from the opinions of the physicians who performed the autopsy as to the duration of the rigor mortis, which they found on this examination. This again depends, as appears, on whether the rigor mortis they then observed was advancing or receding; and this fact they did not determine. The condition then observed, if rigor mortis was advancing, would indicate that Manzella's death occurred about 3 o'clock in the morning of Monday, the 30th, and, if receding, that it may have occurred some 24 hours earlier. If it occurred at the earlier hour, the time would correspond very nearly with the hour, 3 o'clock on Sunday morning, at which it is conceded that Joseph Galbo went to the store, and, on knocking at the door, was admitted by the defendant Domenico; he then being apparently fully dressed, although the witness who testifies to seeing him at that time is unable to state whether he had his shoes on. The people's evidence of this visit is given by a police officer, who saw and spoke to Joseph Galbo at that time, to whom, as he testifies, the former explained his early visit to the store by saying that he expected a car load of bananas, which he was anxious to unload early, as he intended to go to Buffalo that day. Though the Galbos unloaded a car of bananas later that morning, beginning the work about 7 o'clock, there is no pretense that Joseph Galbo went to Buffalo; and he, in addition to denying the conversation with the officer on that subject, says that in fact he had no such intention. If the officer's statement as to this interview is true, the fact that Joseph Galbo explained his unseasonable visit to the store by giving a false reason therefor is doubtless a circumstance to be considered, in view of the subsequent facts disclosed by the evidence.

When the barrel containing the body was discovered in the ravine, there were also found near it a blood-stained piece of burlap, or sacking, and a rope. The inference is apparent that this piece of burlap had been tied with the rope over the open top of the barrel, and had fallen off as the barrel rolled down the steep side of the ravine from the margin of the highway. The rope itself furnishes a significant bit of evidence. It was made up of two pieces tied together, and in general appearance, emphasized by the significant rust and other marks thereon, warranted the conclusion that it was made up of two pieces of rope used by defendant and his brother to suspend clusters of bananas from hooks in the store occupied by them. A number of similar ropes, with like marks of use thereon, were afterwards found in the store, each hanging from a hook. But from

two of these hooks the ropes were gone. The barrel and burlap sack, as well as a time-card on which were spots of blood, were identified and traced, so that the inference might fairly be drawn that they were all obtained, or came from, these same premises, and the possession of defendant and his brother. It also appears that defendant had in the prosecution of his business frequent occasion to drive over this highway, and had opportunity to observe the favorable conditions for concealment of an object like the barrel in question in the ravine. We are further agreed that the evidence, which it is not necessary to recite in detail, amply warranted a finding by the jury that, with the intention and for the purpose of concealing and disposing of Manzella's body, in the darkness of the early morning of October 29, 1911, this defendant, with the team and banana wagon usually driven by him in his business, carried the barrel containing the body to this ravine, and placed and left it where it was found, as already stated, a few hours later.

[4] The important question still left for consideration is: What inference as to defendant's connection with Manzella's death could the jury properly draw from these facts? We have already said that the facts as to the manner in which Manzella was killed in and of themselves showed that the author of the death was guilty of the crime of murder. It is urged by appellant that, even conceding that the proof warranted the conclusion that he was concerned in the actual concealment and disposition of the body of a man known to him to have been murdered, yet this fact furnishes proof only that he was guilty as an accessory after the fact. But the rule of evidence to be here applied does not support the claim. In Burril on Circ. Ev. p. 83, it is said:

"Thus guilt is known to have certain indicia, or badges almost invariably attached to it; such as attempts to hide a crime committed, to escape from punishment, and the like. When, therefore, it is shown by evidence that a certain person has attempted to hide the dead body of another, upon which marks of violence are discovered, or was seen, on approach of a third person, to fly from the place where the body was found, or has fled or concealed himself in such a case from the pursuit of justice, the reasoning is to attribute such conduct to the cause or motive known to actuate the guilty under such circumstances, and the probable inference therefore is to connect the individual with the crime as author or participator."

This statement of the probable inference to be drawn from the proven fact that a person had concealed the body of the victim of a homicide is approved in State v. Dickson, 78 Mo. 438. Similar enunciation of the rule appears in the text of various authors who have treated the question of the effect of circumstantial or presumptive evidence.

The probative value of this class of evidence has been frequently recognized by our own courts. In People v. Place, 157 N. Y. 584, 598, 52 N. E. 576, 581, it is written that:

"The demeanor, conduct, and acts of a person charged with crime, such as attempted flight, a desire to elude discovery, an anxiety to conceal the crime, or the evidence of it, are always proper subjects of consideration, as indicative of a guilty mind, and in determining the question of the guilt or innocence of the person charged."

The basic principle, upon which the rule of evidence above adverted to is supported, resembles that upon which is based the kindred rule, which has been often recognized and followed in our own courts, that:

"Proof of the exclusive possession by the prisoner, recently after the theft, of the whole or some part of the stolen property, is sufficient, when standing alone, to throw upon him the burden of showing how he came by it." Knickerbocker v. People, 43 N. Y. 177; Stover v. People, 56 N. Y. 315.

Not only did the defendant not attempt to explain in any way his possession and attempted concealment of Manzella's body, but he denied positively and emphatically that he had any connection with the transaction at any time. These statements the jury evidently found were untrue. This fact the jury might properly consider as militating against any presumption of his innocence, and tending to support the presumption of guilt.

If the probable inference from the facts shown as to defendant's possession and attempted concealment of the body was that he was either an author or participator in the killing of Manzella, then it necessarily follows that he could properly be found guilty of the crime committed when Manzella was killed. We may here paraphrase and adopt the reasoning of Judge Peckham in Knickerbocker v. People, supra. Here it is entirely clear, from the manner of the killing, that the crime proved was the murder of Manzella, and no other. The recent possession thereafter and the attempted concealment of the body of the murdered man is evidence of that crime, as no other crime than murder was proved. It proves that crime, or it proves nothing. Strike out the proof of murder in this case, and the defendant is proved guilty of no crime. Insert it, and the possession and attempted concealment of the body warrants the inference that he is guilty of that crime.

[5, 6] It is also urged for appellant that no motive for killing Manzella was shown. While it is not necessary for the people to prove a motive in such a case, yet it is also true that proof of motive furnishes corroboration in a case depending on circumstantial evidence. People v. Johnson, 139 N. Y. 358, 34 N. E. 920. Though there is little evidence to connect defendant with any personal advantage to accrue to him from Manzella's death, yet the evidence of Joseph Galbo, the brother and partner of defendant, discloses that Manzella, the convicted and, as appellant's counsel urges, the professional extortioner, on the day preceding the murder, demanded money of him under circumstances and in terms indicating a covert threat of what he would do to Ollis, the father-in-law of Joseph, if the demand was not complied with. This evidence was for the jury to weigh and consider; and we cannot say that it would not warrant the inference that this means was taken for ridding himself and his family of further importunate and threatening demands.

We have considered the other grounds urged by appellant for the reversal of the judgment, and conclude that they do not present error calling for that determination.

The judgment of conviction, and order denying a new trial, should be affirmed. All concur, except KRUSE and LAMBERT, JJ., who dissent in an opinion by

LAMBERT, J. (dissenting). The defendant and his brother, Joseph Galbo, have been indicted for the crime of murder in the first degree, for the killing of one Manzella. Separate trials were demanded, and the defendant has been convicted of the crime of murder in the second degree. Briefly stated, the facts urged as sufficient to sustain this conviction are as follows:

On Monday, October 30, 1911, one Smith, having occasion to visit a ravine near the Webster Road, a short distance out of the City of Rochester, noticed, upon the side of such ravine, a burlap sack. Closer examination disclosed blood stains on this sack and upon a cord lying near it. His curiosity being aroused, Smith investigated further, and in the bottom of this gulf he found a barrel, in which was the body of the deceased. The authorities were promptly notified, and an investigation commenced, which has resulted in the apprehension of these two men and the conviction of the defendant.

The identity of the deceased having been established, it was learned that for a short interval previously he had frequented, to some extent, the room occupied by the defendant. This room is located over a fruit store conducted by the defendant and his brother in the city of Rochester. This fruit business seems to have been quite extensive and successful. It was further established that deceased had previously been convicted of extortion, and had served a term in state prison for that offense, and on the Saturday preceding this discovery he had demanded money of Joseph Galbo, and had been refused. He had likewise, on the same day, demanded money of one Ollis, the father-in-law of Joseph Galbo. Ollis did not pay him money, but promised to do so that night, if he would return. So far as shown by the proof, he did not return, and his whereabouts from such time until his death remain unaccounted for, although one witness for the defense testifies to having seen him the following day.

Joseph Galbo did not reside with the defendant, and at about 3 o'clock on Sunday morning a police officer observed Joseph seeking admittance to the defendant's room. In response to his knocking, the defendant came to the door and was observed to be fully dressed. Several witnesses were found, who early on Monday morning observed a fruit wagon proceeding along the Webster Road, drawn by two horses. Some of these witnesses observed this rig going away from the city, and others saw it returning. All give it a description corresponding with a wagon and team owned by these Galbo brothers, and there is some direct evidence that the driver of that wagon was the defendant. There is also evidence justifying the conclusion that there was a barrel in this wagon while it was proceeding away from the city.

Evidence was also produced from which it might be inferred that the barrel, in which this body was found, was one of a shipment of several made to the defendant and his brother from Laona, N. Y. The burlap sack is shown to have been originally sold by a Chicago firm. Similar sacks are traced from such firm, through various parties, into the possession of the defendant and his brother. The cord, found close to the sack, is shown to be identical with many found in the fruit store conducted by these men. It was made up of two pieces,

knotted together, and two of such cords were found to be missing from the hooks in the ceiling of such store used for the suspension of bunches of bananas. Shavings, discolored by a pigment used to color tomato pulp, were found in the barrel containing this body. Similar shavings, likewise discolored, were found in the barn used in connection with this fruit store. Pieces of brick, also found in the barrel, correspond with similar fragments found in this same barn. In the stove in defendant's room were found buckles apparently once used upon clothing.

A detective was placed in the place of confinement of these brothers as an apparent prisoner. This man was an Italian, and was able to understand conversation between these brothers. He testified that, while they were in jail, they talked of being afraid, and disclaimed any fear, and that the defendant stated that he was "driving the wagon." What particular situation or circumstances were referred to in this conversation does not appear, except by inference.

Deceased was muscular and well developed. His body, when found, was badly mutilated. The head was completely severed. Both legs were nearly severed, through the upper thighs, and were bent backward, close to the body. There were upwards of 20 other injuries, consisting entirely of bruises. The most serious of these were upon the head, and such were extensive enough to produce unconsciousness, but not death. At the time of the autopsy, rigor mortis was present to some degree; but it was not determined whether it was advancing or receding. Based upon this condition, so found, the physicians express the opinion that the death occurred, either early Monday morning or 24 hours sooner.

The decapitation was by means of a sharp cutting instrument; the spine being severed between two vertabræ, and not sawed through. The flesh of the legs was also cut, while the thigh bones were sawed through, apparently with a fine-toothed saw. The bruises were not made with a sharp instrument, and from their condition the physicians testify that such were probably inflicted prior to death. The cause of the death was the decapitation.

The foregoing, with some proof of contradictory statements by defendant and his brother as to various circumstantial matters, comprise the proof in which is to be found, if at all, the elements essential to sustain the judgment. The proof of the commission of crime and the identity of criminals by means of circumstantial evidence is a practice now well recognized. In fact, such evidence oftentimes is more satisfactory and convincing than the testimony of eyewitnesses. But before a defendant can be deprived of life or liberty, under a conviction dependent upon such evidence, it must be made to appear that the circumstances proven lead naturally and logically to the inference of guilt, and to no other conclusion. It is not sufficient that the circumstances be suspicious. They must exclude every other reasonable hypothesis to be drawn therefrom than the guilt of the defendant. People v. Harris, 136 N. Y. 423, 33 N. E. 65. Such requirement is fairly met with proof of the means and opportunity, the inclination, the sufficient motive, and proof of the commission of the crime by some person.

But the evidence here does not measure up to that standard. We are furnished with no evidence of the circumstances under which Manzella met his death. The time of the killing remains in doubt. Its place we cannot even surmise. Although enormous effort was expended upon this case by the prosecution, and careful detailed examination made of the premises occupied and frequented by the defendant and his brother, no blood stains or evidences of struggle were found. And it is further significant that, although the deceased, a muscular, well-developed man, was covered with bruises inflicted prior to his death, neither the defendant, who is a cripple, nor his brother, exhibited the slightest evidence of having engaged in any affray. Nor does the demand for small amounts of money furnish very cogent proof of a sufficient motive. There is a total lack of proof of opportunity, and the only suggestion of inclination flows from the claimed motive, and rests in inference purely.

The circumstances shown justify the conclusion by the jury that defendant and his brother had possession of this body and were endeavoring to conceal it, and we are asked to conclude from that fact, supported by the claimed proof of motive, that defendant did commit the crime of which he stands convicted. To support such contention, we are referred to a class of larceny cases, illustrated by Knickerbocker v. People, 43 N. Y. 177. It is urged that by such cases the rule is established that possession of stolen goods, shortly after their theft, is sufficient to charge the possessor with such theft, and to shift to him the burden of explaining his possession, and we are asked to apply such rule to this case. It can have no application here. In the larceny cases referred to, there was always present the direct proof of the larceny by some person, and the possession is made sufficient only to establish the identity of the thief, and such possession is in each of such cases also established by direct proof.

Both features are lacking here. Murder, in either degree, includes certain elements, established by statute and required to be affirmatively shown. None of such elements are present in larceny cases. It must be shown that the homicide was neither justifiable nor excusable, and that there was a design to effect the death. The record discloses no proof of either of these elements, and they must be inferred, if found at all. Then, too, there is no direct proof of the possession of the body by the defendant. He has never admitted such possession, but has invariably denied it, and has supported his denials with rather cogent proof that early on Monday morning he was at the hamlet of Fairport, selling a load of bananas he had driven from Rochester. While proof of possession of the body is persuasive proof, and especially effective as to the identity of the person charged, I am not advised that it is sufficient, standing alone, to supply all necessity for evidence of design to effect death, and to negative justification and excuse for the homicide. Nor am I prepared to award any such attributes to such evidence. To do so would be to go much further than any decision known to me. If this record contained direct evidence that deceased had been murdered by some person, and direct proof of the possession of the body by defendant for purposes of concealment, then there might be room for the application of the fore-

going rule; but with those elements lacking there is no room for its application.

While a great mass of detail proof was offered by the prosecution, it is confined almost entirely to circumstances tending to show possession of the body by defendant, and, as above indicated, is sufficient for that purpose. But a well-established rule of law, applicable to those cases where circumstantial evidence is relied upon, prohibits the affirmance of this conviction. The fact of the possession of the body is the strong element in the case of the prosecution. With that feature eliminated, it could not be seriously urged that enough remained to justify any serious claim for the sufficiency of the proof. That fact, then, is essential to sustain the judgment. But the fact of such possession is not testified to directly by any witness. It is explicitly denied by the defendant, and it is only by way of justifiable inference from a number of distinct circumstances that the conclusion of such possession is made permissible. The first step, then, is to infer such fact. With such fact thus established, we are asked to infer the further fact of the guilt of the defendant. This second step also rests in inference, and is dependent for its soundness upon the first conclusion sought to be drawn. Such a course of reasoning requires that the inference of guilt shall be premised upon the prior conclusion of possession. This manner of basing an inference upon an inference has been condemned, both in civil cases (Lamb v. Union Ry. Co., 195 N. Y. 260, 266, 88 N. E. 371) and in homicide cases (People v. Razezicz, 206 N. Y. 249, 99 N. E. 557). The reason for such rule has frequently been stated to lie in the fact that no reliable conclusion can be drawn from premises which themselves lie in inference, and that, while from given facts it is permissible to draw an inference of fact, the foundation for such inference must rest in direct testimony. People v. Place, 157 N. Y. 584, 594, 52 N. E. 576.

There are also, among the many exceptions urged, several which merit mention. The district attorney was allowed to go to great lengths in his examination of a witness called by the prosecution, by way of constantly referring to the grand jury minutes, in his examination, and by reference thereto compelling the admission of the witness that he so testified before the grand jury. Defendant's counsel then requested the use of the same minutes, for purposes of cross-examination. The court held that it had no power to so order. That such power did so exist in the court I have no doubt. The request should have been granted, inasmuch as the district attorney had seen fit to use such excerpts therefrom as suited his needs, and by constant and direct reference thereto to substantially read such portions in evidence. Defendant, then, should have been allowed access to such minutes, for purposes of cross-examination. The remarks of the district attorney, in this connection, to the effect that he would not allow the grand jury minutes in any Italian case to be seen, were highly improper.

Further, a detective, McInerny, called for the prosecution, was allowed to testify that another witness identified the Galbo wagon as the wagon seen by him at a certain time and place. This evidence was improper for two reasons. It was, at most, the unsworn declaration

cf the other witness. And it embodied McInerny's conclusion as to the effect of what the witness said or did in making the identification. This last ruling could not but be prejudicial to the defendant. This evidence went directly to the important feature of the case, the possession of the body by the defendant.

The gravity of these incidents is increased by the fact that the people's case is so lacking in essential elements. Under such circumstances, we cannot assume that there was no right of the defendant prejudiced thereby, or that these incidents of the trial did not each lend aid to the result expressed by the verdict.

The judgment and order appealed from should be reversed, and a new trial ordered.

KRUSE, J., concurs.