# Court of Appeals.

## October, 1897.

## PEOPLE v. EDWARD HUGHSON.

1. CRIMINAL LAW—JURY—BIAS.

   A juror cannot be disqualified by asking questions with reference to his views, or the effect that would be produced upon his mind by certain evidence which may be introduced on the trial.

2. SAME.

   The fact that the juror does not approve of the carrying of a revolver or other concealed weapon in violation of the statute, does not necessarily disqualify him from serving upon a jury, or prevent him from determining the guilt or innocence of the accused as an impartial juror.

3. SAME—EVIDENCE.

   Declarations or statements, made by another in the presence of a party, when admissible, are taken, not as evidence in themselves, but to enable the court or jury to understand the force and effect that should be given to the reply made thereto by the party affected.

4. SAME.

   Where the defendant admits the shooting and puts his defense upon the fact that he was, at the time it was done, unconscious and not criminally responsible for his acts, his actions, conduct and statements, shortly afterward, become competent, as bearing upon his mental condition.

5. SAME.

   If the defendant, at the time he was charged with the crime, knew that the shooting had been done by himself, and denied it, it is a circumstance which the jury may properly consider as bearing upon the question of his guilt and his mental responsibility.

6. SAME—CHARGE.

   The fact that the trial judge in defining murder in the first degree included statutory provisions, inapplicable to the case, does not present reversible error, where, though he did not in specific terms withdraw such provisions from the jury, he limited their consideration to the killing with deliberation and premeditation.

7. SAME—GOOD CHARACTER.

   Good character may create a doubt against positive evidence, but this doubt is created only when, in the judgment of the jury, the character is so good as to raise a doubt as to the truthfulness or correctness of the positive evidence.

8. SAME—EXHIBITS WITH JURY.

> Where the court, at the retirement of the jury, inquires if there is any objection to the jury taking the exhibits, the clothing of the deceased, which was made an exhibit upon the trial, is deemed included in the inquiry, so as to demand an objection from the defendant in case he does not wish the clothing to be left with the jury.

Appeal from a judgment, convicting the defendant of murder in the first degree.

Patrick C. Dugan, for appellant.

Eugene Burlingame, Dist. Atty., for the people.

HAIGHT, J.—About eight o'clock in the morning of the 23d day of June, 1896, Elizabeth Hughson, the wife of the defendant, was found, in the house occupied by her, covered with blood, and suffering from four gunshot wounds. One bullet had entered the back part of the head, struck the skull, deflected downward, and lodged in the muscles of the neck; another had entered near the nose, passing nearly through the head, and imbedded itself in the brain tissues; another had lodged in the bones of the wrist; and the other had passed through the index finger. She was conveyed to a hospital in the city of Albany, where she died on the third day thereafter. The defendant was about twenty-six years of age. He had been married to the deceased two years, and they had one child. On the 17th day of September, 1894, he entered the employ of Charles Hinckel, in the capacity of a coachman, and took up his residence with his wife in the lodge house upon the Hinckel premises, within a few rods of the city line of the city of Albany. In February, 1895, one Anna Rohloff was employed by Mr. and Mrs. Hinckel as a cook in their residence, which was situated a few rods back from the lodge house, which stood at the entrance to their grounds. Shortly thereafter Mrs. Hughson became violently jealous of Anna Rohloff, and accused her of being intimate with her husband, and repeated these charges to Mrs. Hinckel. From that time on, frequent quarrels appear to have taken place between Mrs. Hughson and the defendant with reference to the Rohloff girl, until finally it culminated in her refusing to cook for him, and of his refusing to stay with her in

the lodge house. He thereafter took his meals in the kitchen of the Hinckel residence, and slept in the clubroom of the carriage house. About three weeks before the homicide he went to a pawnshop on Green street, in Albany, and purchased a pistol, together with a box of cartridges. He then returned to the Hinckel residence, and loaded the pistol with four cartridges, leaving two empty chambers. After loading the pistol, he placed it in his hip pocket, and continued to carry it until the morning of the homicide. On Monday, the 22d of June, Mrs. Hinckel and Anna Rohloff went to Albany in the carriage, the defendant driving. After doing some shopping, the defendant, under the directions of Mrs. Hinckel, drove Anna to her own home, on Fourth avenue. It was then arranged that he was to meet her at the end of the Madison avenue street car line, at the corner of Allen street, about twenty-five minutes after ten o'clock, for the purpose of conveying her to the Hinckel residence. He then returned home, put his horses out, and went to his house, between six and seven o'clock. It then appears from his statement in the case that he and his wife had another quarrel, she inquiring who went to town with Mrs. Hinckel, and, on being informed that it was Anna, spoke of her as a vile person, saying that he was a nice coachman, to be driving her about the city, and that she supposed he was going for her again that night; and he said he was. Other expressions then followed, which it is unnecessary to repeat, which very plainly indicated her displeasure and disgust. At the appointed hour he drove over to the end of the car line, got Anna, and returned, reaching the Hinckel residence about forty minutes after ten o'clock in the evening. He states that he drove to the barn; put out his horse; asked Anna to get him the key to the ice house, so that he could get a bottle of beer; that, after he got the beer, he sat down upon the cellar door, at the rear of the kitchen of the Hinckel house, drank it, and smoked his pipe. He tells us that he sat there alone from half to three-quarters of an hour. He then went to the lodge house, and found the door locked, but his wife got up and let him in. She then asked him where he had been since he came from the car. He told her, and that he had got a bottle of beer and smoked his pipe. "She says: 'You lie. You have been over in the kitchen again with the whore.'

I says: 'Lizzie, I have not. I have not seen. Anna since she locked the door and went upstairs.' She says: 'I know better, and, if this thing don't stop, I am going to leave you.' I asked her then what she was going to do,— if she was going to get the divorce she said she was going to get from me. She says: 'No; I will not disgrace my people by getting a divorce. Before I will do that, I will kill myself.' I says: 'Go on to bed. I don't feel like quarreling to-night. I have a headache, and I don't want to have anything more to say to you about it.' She says: 'I will not shut up,' and she whirled around to the stand that set at the side of the bedroom door; and picked up a saucer and threw it at me. I jumped up, and threw my hand up over my head to ward off the blow, and I lost myself entirely from that time. When I woke the next morning I was in the clubroom, on the floor. I had my coat and clothes on, the same as I was the night before. The minute I woke up, it came to me about my wife quarreling with me, and, some way, that I had heard a pistol shot. I could not remember. I thought I heard a pistol shot some time during the night. I jumped up and grabbed my pistol out of my pocket, to see if it had been shot, and the cylinder of it was gone; and I went right out in the wagon house,—started to go over home. When I got where I could see the clock, it was twenty minutes of six, and I expected Mr. Hinckel out any minute to take his horse. So I put on my overalls and jacket, and went in the stable and got his horse ready, and I just got his horse hooked when he came out and drove away. As soon as he drove away I took the pistol that I had,—what was left of it,—and walked around back of the ice house, and threw it under the corner of the old carriage house. I was scared. I don't know what to do. I went back, and started to go over to my house, to see if I was right in hearing that pistol shot. I got over as far as the little play house for the children, and looked over to the house, and saw smoke coming out of the chimney; and I thought then everything was all right,—that she was up,—so I turned and went back to the barn.'" This is the defendant's version of the transaction. It appeared, however, the next morning, that the front door was locked, and that the door between the living part and the new apartment which was being fixed was bolted or fastened, and that, in order

to enter the living room, he and another man had to push the door open. There was evidence tending to show that the drawers had been opened, and the contents scattered about the room; that the money in Mrs. Hughson's purse had been taken from it, and it lay open upon the stand; that a half-dozen silver plated salt cellars had been taken from the house, and were subsequently found under the carriage house where he had thrown his pistol. When entrance was first effected to the house in the morning, Mrs. Hughson was standing behind the door. When questioned as to what was the matter with her, she replied that she had fallen down stairs, but subsequently, after a neighboring woman had arrived, and it was found that she had gunshot wounds, she said, in the presence of her husband, that he had done it. This he denied, but he had made the statement that she had been shot before that fact had been discovered by others, and he evidently sought to have the impression go out that the house had been entered by burglars, who had done the shooting. We have but briefly alluded to the evidence, passing over many of the details without mention. It was submitted to the jury upon an impartial charge, and the verdict has been found against the defendant. We have carefully examined the evidence and are fully satisfied that it supports the conclusion reached by the jury. The circumstances quite clearly indicate deliberation and premeditation. He had never been in the habit of carrying a revolver until within three weeks of the homicide, and not then until the relation between himself and his wife had become so strained that they could not longer live together. It is true that he claims to have purchased it for the purpose of killing dogs, but he put it to a very different use. The opening of the drawers, the scattering of the contents about the room, the taking of the salt cellars, and the emptying of the purse, all tended to support the theory that the house had been entered by burglars, and, in view of his subsequent admission, practically to the effect that the shooting was done by himself, although, he claims, while in an unconscious condition, leaves no reasonable doubt but that there was deliberation and premeditation prior to the doing of the act.

In impaneling the jury, Jacob Miller was challenged for bias by the defendant. The challenge was overruled by the court, and an

exception taken. He was then sworn, and served as a juror upon the trial, no peremptory challenge being interposed. Upon his examination he was asked if he entertained any prejudice against a party in possession of a pistol or revolver. He answered: " Unless he has permission to carry such a weapon. Q. Suppose he has not permission ? A. Then I have. Q. Strong? A. Yes, sir. Q. And decided? A. Yes, sir. Q. So strong it might influence your verdict? A. Not a bit. Q. The evidence would have to be stronger in his behalf than though the pistol was not spoken of? A. Yes, sir. Q. Whether used or not? A. Yes, sir. Q. You say you entertain a strong prejudice against a party having in his possession firearms? A. Yes, sir. Q. If you were accepted as a juror, and it should develop on the trial that he was in possession of a firearm, would that prejudice influence your verdict? A. No, sir ; not a bit. * * * Q. Do you believe that the prejudice you would have against a party carrying a pistol would influence your verdict upon the evidence that might be submitted ? A. Not a bit." We think no error is presented by the ruling of the court. It will be observed that the examination of the juror was with reference to an abstract question, which, so far as it then appeared, was not involved in the case. It is true that upon the trial it appeared that the defendant had a pistol in his possession, and the jury has found that it was the weapon with which the murder was committed. But it does not appear that the trial court, at the time the ruling was made, was advised that any such evidence would be presented; and, if it had appeared, we should still be inclined to the view. that the ruling should be sustained. Every time the attention of the juror was drawn to the trial of the case, and questioned as to whether the possession of a revolver would in any wise prejudice or influence his mind with reference to his arriving at a verdict, he distinctly answered that it would not a bit. We do not understand that a juror can be disqualified by asking questions with reference to his views, or the effect that would be produced upon his mind from certain evidence which may be produced upon the trial. If so, criminal trials, in many instances, could be avoided for the reason that it might be impossible to find qualified jurors to sit upon the trials. If a person placed upon trial, charged with the crime

of burglary, who, upon being searched at the time of his arrest, was found to have burglar tools secreted in his clothing, should be permitted to disqualify jurors by showing that they had prejudice against men who carried upon their persons such instruments, it might be impossible to find a qualified jury before whom the person could be tried. We doubt if a worthy juryman could be found who could conscientiously testify that he regarded such a person with the same favor as one who had never had such implements in his possession. The same may be true with reference to a revolver carried by a person for an unlawful or improper purpose. Such conduct on the part of a person may not be sanctioned or approved by law abiding citizens. But the fact that the juryman does not approve of the carrying of a revolver or other concealed weapon in violation of the statute does not necessarily disqualify him from serving upon a jury, or prevent him from determining the guilt or innocence of the accused as an impartial juror.

Upon the trial, Pauline Goutchy testified: That on the morning after the shooting, and while Mrs. Hughson was being washed, witness, in the presence of the defendant, asked her how it happened, and that she replied, "Ed did it" (referring to her husband). That the witness then turned to the defendant, who stood by, and said to him, "Ed, is it possible that you done this?" That then he began to cry, and said, "Oh, no! I didn't do it, and I couldn't do anything like that." And then he went away. Declarations or statements made in the presence of a party, when admissible, are taken, not as evidence in themselves, but to enable the court or jury to understand the force and effect that should be given to the reply made thereto by the party affected. Gibney v. Marchay, 34 N. Y. 301; People v. McCarthy, 110 id. 309, 315, 18 N. E. 128; Missouri v. Devlin, 7 Mo. App. 32; State v. Nash, 7 Iowa, 347, 376; Watt v. People, 126 Ill. 9, 18 N. E. 340; 2 Whart. Ev. § 1136; Cow. & H. Notes to Phil. Ev. notes 191, 192. The action, conduct, and statements of a person charged with crime, immediately after its commission often have an important bearing upon the question of his guilt or innocence. If he attempts an escape, or secretes himself, or makes false, contradictory, or inconsistent statements, they all properly become the subject

of inquiry upon the trial.    It is thus apparent that, under the rule
to which we have called attention, the declaration of Mrs. Hughson
to the effect that her husband had shot her was not evidence, or
entitled to be received as evidence, that he did do the shooting;
but that it could only be taken for the purpose of enabling the
jury to understand the force and effect that should be given to
the reply made by him.    If the defense interposed upon the trial
had proceeded upon the theory that the shooting was done by
some other person than the defendant, and this evidence was
introduced solely for the purpose of getting before the jurors the
statement of the deceased accusing the defendant, instead of
enabling them to draw conclusions from his answer made to the
charge, in view of the fact that he then and there denied the shoot-
ing, it is quite possible that an orderly administration of the
criminal law would require that he should be given a new trial.
His case was, however, defended upon a different theory.    When
the crime was discovered, he first suggested the theory that the
house had been broken into by burglars, and the shooting done by
them ; and then, as we have seen, he denied that it was done
by himself.    Subsequently he admitted that he had purchased a
revolver on Green street, in the city of Albany; that he had
loaded it with four cartridges, and that he carried it in his hip
pocket; that he was in the house in company with his wife at a
late hour on the night of the homicide; that they had a violent
quarrel, in which she threw a saucer at him, and that he then
suddenly lost control of himself, and knew nothing further until
he awoke the next morning in the carriage house; that imme-
diately upon awakening he recalled the quarrel of the night before,
and had the impression that he had heard a pistol shot; that he
immediately drew his revolver from his pocket, for the purpose of
seeing whether it had been fired, and, on making the discovery
that it had been used, he became frightened and threw it under
the barn.    He thus, in effect, admitted the shooting; and his
defense was that it was done at a time when he was unconscious,
and not criminally responsible for his acts.    Upon this theory, his
actions, conduct, and statements the next morning became import-
ant, as bearing upon his mental condition.    If, at the time he was
charged with the crime, he knew that the shooting had been done

by himself, and he denied it, it was a circumstance which the jury might properly consider as bearing upon the question of his guilt and his mental responsibility. We are therefore of the opinion that the evidence was competent.

The court, in submitting the case to the jury, defined the crime of murder in the first degree by reading the provisions of the Penal Code with reference thereto, including the statutory definition of an act eminently dangerous to others, and evincing a depraved mind regardless of human life, together, also, with the provision with reference to the effecting the death of a person while engaged in the commission of a felony. He then charged the jury that it must be with a premeditated design to effect the death of the person killed, and that, before they could convict the defendant of murder in the first degree, they must find that there was that degree of deliberation and premeditation which is contemplated by the statute. He did not, in specific terms, withdraw from the attention of the jury the killing of a person by an act imminently dangerous to others, or while engaged in the commission of a felony. He did, however, as we have seen, limit their consideration to the killing with deliberation and premeditation, so that we think there can be no question but that the jury properly understood the court with reference to the crime submitted to them for their determination.

At the close of the trial the defendant requested the court to charge that the evidence of good character may create a doubt against positive evidence of defendant's guilt. The court replied: "It is for the jury to say. The evidence of good character is evidence which must be considered, and, if, in the judgment of the jury, that good character does raise a doubt against positive evidence, they have a right to entertain that doubt, and the prisoner must have the benefit of it." An exception was taken to the charge as made by the court. We think the remarks of the court embraced every element of the request. Good character may create a doubt against positive evidence, but this doubt against positive evidence is created only when, in the judgment of the jury, the character is so good as to raise a doubt as to the truthfulness or correctness of the positive evidence. In such a case the prisoner must be given the benefit of the doubt. The

charge was correct. It but amplified and made more plain the request.

A motion was made to set aside the verdict upon various grounds, among which is the claim that the defendant was prejudiced by the leaving in the jury-room the blood-stained garments of the deceased, which had been made exhibits upon the trial. Section 425 of the Code of Criminal Procedure provides that the court may permit the jury, upon retiring for deliberation, to take with them any paper or article which has been received as evidence in the case, but only upon the consent of the defendant and the counsel for the people. The evidence presented upon the motion tends to show that at the time the jury was about to retire the question was asked as to whether they should be given the exhibits, and that thereupon the court inquired if there was any objection. None being made, they were given the exhibits that had been admitted in evidence upon the trial. The defendant now contends that he understood that only the paper exhibits were to be given to the jurors, and did not understand that the clothing was to be further inspected by them. We think, however, that the term "exhibits," embraced in the inquiry of the court, had reference to the clothing as well as the other articles and papers, and that, if the defendant did not wish them to be left in the charge of the jury, an objection should have been interposed when the court asked if there was any objection.

No other exception is presented which requires consideration here. The judgment and conviction should be affirmed.

All concur.

Judgment affirmed.