[Criminal No. 370. Filed September 23, 1915.]

[151 Pac. 947.]

ATHA M. LEONARD and JOHN TOMLIN, Appellants, v. STATE, Respondent.

1. CRIMINAL LAW—CONTINUANCE.—In a prosecution for murder, an affidavit for continuance, stating that the absent witness would testify to threats against defendant by decedent, which failed to set forth any overt act justifying evidence of threats, was not ground for continuance, since, before threats may be proved as a justification for taking life, evidence of some overt act or hostile demonstration on the part of deceased must be shown.

2. CRIMINAL LAW—DEFENSES.—A defendant, under the general plea of not guilty, may set up the defense of insanity, alibi or self-defense.

3. CRIMINAL LAW—TRIAL—CONTINUANCE—AFFIDAVIT ON INFORMATION AND BELIEF.—In a prosecution for murder, where, an affidavit for continuance stated that the desired witness communicated to defendant the threat of deceased, which it was stated the witness would testify to, so that the affiant's knowledge of the fact must have been obtained from the defendant, and not the witness, although affiant did not say from whom he got his information, such affidavit was defective, since an affidavit should not be based on information and belief.

4. CRIMINAL LAW—APPEAL AND ERROR—INVITED ERROR—REMARKS OF COURT AND PROSECUTOR.—In a prosecution for murder, where, before the adjournment for the day, defendant's counsel stated in open court that they desired the jury to remain together until the case was closed, to which the court stated that he would not take the step of his own volition, but would do so if counsel filed written request as required by statute, and the prosecuting attorney stated that he did not think the court should keep the jury together unless counsel complied with all the requirements, on appeal defendant could not complain of the statements of the court and prosecutor as a violation of Penal Code of 1913, section 1063, providing that the court shall not mention in the presence of the jury which party requested that they be kept together, since the replies were invited by the oral manner in which defendant's counsel preferred their request.

5. CRIMINAL LAW—TRIAL—REMARKS OF COUNSEL.—In a prosecution for murder, where defendant's counsel orally requested that the jury be not allowed to separate before the end of the trial, the statement at the close of the evidence, in a colloquy between court and counsel, by the prosecuting attorney, that the jury was not locked up on the prosecution's application, was not prejudicial error, as it was merely repeating a fact of which the jury were aware through defendant's counsel.

6. HOMICIDE—EVIDENCE—COMMISSION OF BURGLARY.—Where defendants, after killing a city marshal, stole a buggy and fled, and thereafter broke into a store to supply themselves with food and clothing, in the prosecution for the murder, defendants being identified as the parties who committed the burglary, and it being established that the same persons committed both crimes, evidence of such breaking was admissible as one of the circumstances of their flight, identifying them as the murderers, since the facts of an accused's flight, escape, resistance to arrest, concealment, assumption of false name, and related conduct, are admissible as evidence of consciousness of guilt, and so of guilt itself.

[As to homicide in commission of burglary, see note in 90 Am. St. Rep. 579.]

7. HOMICIDE—EVIDENCE—MOTIVE.—In a prosecution for murder of a city marshal, evidence that one of the defendants had been jailed some time before by the decedent, and that the other defendant had trouble with decedent four years before the homicide, was admissible as showing motive.

8. CRIMINAL LAW—TRIAL—REMARKS OF COUNSEL.—In a prosecution for homicide, where the prosecuting attorney, answering an objection by defendants to the introduction of evidence, stated that it could not prejudice the defendants in the jury's eyes, that nothing could so prejudice them, in view of the fact that the case was clear, without doubt as to the persons who committed the crime, or their justification for it, the language was harmless to defendants.

9. HOMICIDE—EVIDENCE—CHARACTER OF DECEASED—NEGATIVE TESTIMONY.—In a prosecution for murder, where defendants set up self-defense and undertook to prove that deceased, a city marshal, was a man of turbulent and violent character, the negative rebutting testimony of witnesses, who had lived in the same community with him for a number of years, that they had never heard his reputation for peace and quiet questioned, was admissible as the best possible evidence on the point.

10. CRIMINAL LAW—TRIAL — INSTRUCTIONS — REPETITION. — Requested charges, fully covered by others given, need not be repeated.

APPEAL from the Superior Court of the County of Maricopa. J. C. Phillips, Judge. Affirmed.

Mr. R. H. Brumback, for Appellants.

Mr. Wiley E. Jones, Attorney General, and Mr. Leslie C. Hardy and Mr. Geo. W. Harben, Assistant Attorneys General, for the State.

ROSS, C. J.—The appellants were convicted of the crime of murder, committed on November 12, 1913, in Maricopa county, with the penalty of death affixed. From the judgment of conviction, the appellants prosecute this appeal, and assign numerous errors. For a better understanding of the errors assigned, we give an outline of the evidence.

Between 7:30 and 8 o'clock P. M., November 12, 1913, at Mesa, on the corner of North Main and Robinson streets, two bicycles were stolen. Two parties were seen by O. L. Pickens approach near where he lived, and not very far from where the bicycles were taken, when one of them broke a lock on one of the bicycles. They then got on the wheels and rode very

rapidly along the street by his house. About 9 or 9:30 o'clock the owners discovered their loss, whereupon H. S. Peterson, who was the city marshal of Mesa, and Pickens, James McDonald and Ivan McDonald took up the tracks of the bicycles and followed them for a short distance only, when the pursuing party saw two men some 500 feet ahead of them get on to bicycles and make off in the opposite direction. Peterson, who had with him a bicycle, followed along the road after the other two bicyclists, and the other parties, Pickens and McDonalds, took short cuts across some inclosures. It was not long until Pickens heard Peterson say, "Stop there, boys!" Almost instantly he says he heard seven shots—six in quick succession, and the seventh after a slight intermission. When he arrived Peterson was lying in or near the middle of the road. He said:

"I am shot all to pieces, and I don't see why they done it. I don't know why they done it," or "I don't see why they done it."

The McDonalds had arrived before Pickens, and when they reached Peterson three bicycles were lying on the ground some 15 feet apart. Two of the bicycles were afterward identified as the ones stolen. The parties who had taken the bicycles and who had shot Peterson had fled. Peterson was shot in some five or six places. He lived only a short time. The only identification of the parties who shot him, that he gave, was that they were "white men" (not Mexicans). The appellants left the scene of the killing on foot, and on the following day the officers took up their tracks and traced them to Longmore's ranch, about a mile and a half distant, where they entered the Longmore stables and took a horse, harness and buggy. The buggy was found the next day in Phoenix, where it had been abandoned in lieu of two horses and two saddles belonging to George Tisdale, for whom they had before that worked. Between Five and Six Points, in Phoenix, they got some bedding of their own and proceeded north. The night of the 12th someone entered the store of Geo. Irving, at Alhambra, some five miles north of Phoenix, taking therefrom some overalls, shirts, gloves, bacon and flour. Some of the articles taken from the store were in the possession of appellants when arrested, and were identified by Irving as his property. The officers were able to trace

appellants in their flight by reason of these different takings of property, until they passed on out of the much-traveled communities into the desert, and then their tracks were followed north, via Brills Tank, Wickenburg, Congress Junction, and to Date Creek, in Yavapai county, where on the fourteenth day of November, about 1 o'clock, the officers overtook them in camp, preparing a meal. They were searched, and each was found to be carrying a revolver. They had two of the horses—one belonging to Longmore and one to Tisdale—and two saddles and some of the property taken from Irving's store.

The appellants voluntarily told the officers that they had killed Peterson, but claimed that they had been compelled to do so in their self-defense. They also described to the officers their flight and the means used to effect it—as the taking of Longmore's horse, buggy and harness, the two horses and saddles of Tisdale, the bedding, and the route taken. They admitted they entered the Irving store and got the articles found on them.

The prosecution, for the purpose of showing motive on the part of appellants, introduced evidence that Leonard, some three or four years previous to the homicide, had lived in Mesa, and that Peterson, as city marshal, had on at least two occasions had to reprimand or discipline him; that about a month prior to the homicide Tomlin had gone to Mesa, and because of his behavior was put in jail overnight. Leonard in his behalf introduced evidence of the same troubles between him and Peterson, and of threats by Peterson that he would kill Leonard the first chance he got. It was the contention of appellants that Peterson, upon overtaking them and discovering Leonard, undertook to carry out these threats, and without any overt act upon their part he drew his gun and shot Leonard in the leg, and that what they did was in self-defense.

The appellants also testified that on the afternoon of November 12th they left Phoenix and walked to Mesa, seeking work with a building contractor by name of Jennings, who was constructing a building at Mesa. They said they made inquiry of a man named Blacky Cleveland as to the whereabouts of Jennings, and were informed that he was in Tempe; that they took the two bicycles and rode them to Tempe,

where they remained but a few minutes, and, failing to find Jennings, for whom they were looking, they returned to Mesa, arriving in the outskirts of the town about 8 o'clock in the evening; that, while riding along the streets of Mesa, they heard someone behind them call, "Stop, or I will stop you!" that they stopped, and when Peterson came up to them he reached for his gun and said to Leonard, "Now, I have got you," and shoved it in Leonard's stomach, who knocked it down, when it went off, striking Leonard in the leg; that they then shot Peterson, as above stated, some five or six times. No one saw the appellants in Mesa or Tempe on the 12th, or at least no one is shown to have seen them, except Pickens, when they took the bicycles. Blacky Cleveland, of whom they say they made inquiry for Jennings, swore that he did not see them in Mesa, and that they did not inquire of him for Jennings. The only description given of them by Peterson was that they were "white men." No one knew who had killed Peterson until the appellants were traced to Date Creek, in Yavapai county, and arrested. All that was known was that the persons who stole the bicycles before the homicide, and the horses, buggy, harness and stuff from Irving's store at Alhambra after the homicide, were the persons who killed Peterson.

The theory of the prosecution was that the appellants killed the city marshal out of revenge, because he had reprimanded or disciplined Leonard as related, and had put Tomlin in the city jail; that appellants did not go to Mesa seeking employment, as claimed by them, but that they went to do just what they did do; that they took the bicycles as a decoy, to lure the city marshal to the outskirts of Mesa, for the sole and only purpose of taking his life. The theory of the appellants was that the city marshal, upon overtaking them, at once proceeded to put into execution the threats made, or claimed to have been made, by him that he would kill Leonard the first chance. We will take up and consider the assignments somewhat in the order they have been presented to us in appellants' brief.

On the morning of the day the case was set for trial, February 19, 1914, the appellants filed an application for a continuance on account of the absence of a witness. The affidavit for continuance was made by one of the attorneys

for appellants, and, omitting that part showing diligence and
the inability of the witness to attend on account of sickness,
and that she was a nonresident of Arizona, the affidavit pro-
ceeded:

"Affiant further says that he expects to prove by said Mrs.
Theo Young the following facts: That she is a sister of de-
fendant Atha M. Leonard. That at various times prior to
November 12, 1913, the deceased, H. S. Peterson, did in the
presence of the said Mrs. Theo Young make certain threats
against the life of said defendant Atha M. Leonard; he, the
said H. S. Peterson, using words substantially as follows: 'I
will kill him (referring to defendant Atha M. Leonard) the
first chance I get.' That she, the said Mrs. Theo Young,
afterward and before the 12th day of November, 1913, com-
municated to and told said defendant Atha M. Leonard of
such threats made by said H. S. Peterson, and by reason of
such threats made as aforesaid by the said H. S. Peterson
defendant Atha M. Leonard was put in great fear of his life.
That affiant is informed and believes that said Mrs. Theo
Young will testify to certain other matters material to the
defense of this cause, the matters and substance of which your
affiant is not at this time fully informed. Affiant further says
that if a continuance of the trial of this action be granted
until a further date he will be able, as he believes and in-
tends, to procure the attendance of said witness, or take her
deposition."

The continuance was denied, and we think properly so.
It is elementary that, before threats may be proved as a jus-
tification for taking life, evidence of some overt act or hostile
demonstration on the part of the deceased must first be
shown. The affidavit is lacking in its failure to set forth any
fact justifying evidence of threats. From an inspection of
it by the court, the defense of self-defense could not be dis-
covered. The appellants had pleaded not guilty, and under
that plea it is true that self-defense could be interposed—so
could insanity or an *alibi*. The affidavit was also defective,
in that it was based on information and belief. The state-
ment is that Mrs. Young communicated the threat to appellant
Leonard. Affiant's knowledge, therefore, must have been ob-
tained from Leonard, and not the witness Young, although
the affiant does not say from whom he got his information.

What the witness might testify to, if present, is stated in a conjectural form; for affiant says "he expects to prove by said Mrs. Theo Young the following facts." To refuse a continuance on such an affidavit was no error. *Eytinge* v. *Territory,* 12 Ariz. 131, 100 Pac. 443.

The next three errors complained of may be considered together. Just before the adjournment of court on Friday, the court had instructed the jury not to converse with each other, nor with anyone else, nor to allow anyone to speak to them concerning the case, and not to form or express any opinion concerning the case during the intermission, and was in the act of excusing the jury until the following Tuesday, when one of the attorneys for the appellants said:

"I do not like to do this, and were it not for the seriousness of this case, and its importance to these defendants, I certainly would not urge this; but we feel we must insist upon the jury remaining together and not being separated until after this case is closed. In fact, we have felt that all the time.

"By the Court: I am not going to do this of my own volition. I know the statute requires it; and, if you insist upon it, I will. If you put your request in writing, as the statute requires and you are required, this court will do it.

"The County Attorney: I do not think the court ought to do this under the circumstances, unless counsel comply with all of the requirements and make it obligatory to do it. It is quite a serious inconvenience to these men to be locked up.

"The Attorney for Appellants: It is a great deal more serious to these defendants. I want time to make the legal request and comply with the statutes.

"By the Court: Gentlemen, I will ask you to remain seated here. Do you intend to file a written request?

"The Attorney for Appellants: We will file a written request."

The appellants now complain of the remarks made by the court and by the county attorney upon the matter of keeping the jury together in charge of an officer. The language used by the court and the county attorney was called forth by the appellants themselves. The court might have remained silent, or privately directed the attention of counsel to the statute;

but he did, under the circumstances, only what was natural. Section 1063 of the Penal Code provides:

"At the written request of the county attorney or of counsel for defendant, the court shall direct the jury to be kept together in charge of an officer, and the court shall not mention or announce in the presence of the jury which party made such request."

The court did not violate the language or spirit of this section. On the contrary, the appellants themselves told the jury of their request to have them kept together in charge of an officer; and while it was error, it was error on the part of the appellants, and not on the part of the court, and of this they have no right to complain. Counsel for appellants should have followed the statute, and made their written request to have the jury kept together in charge of an officer. This was their right and plain duty. Reversals for errors committed by appellants' counsel would naturally have the effect of encouraging such errors, especially in desperate cases.

At the close of the evidence, in a colloquy between the court and counsel, the county attorney made the statement that "they [the jury] were not locked up on our application." This statement probably had better not have been made; but it was only repeating a fact of which the jury had full knowledge, obtained through the conduct of appellants.

It is said the court erred in permitting the prosecution to offer evidence of the breaking into the Irving store on the night of the 12th of November and the taking therefrom of some articles of food and clothing. This evidence doubtless would constitute error, if the appellants had not been identified as the parties who committed the burglary and theft, and if it had not been one of the circumstances of their flight, identifying them as the parties who killed Peterson, and a clew to the officers of the course or direction of their flight. Like the taking of the buggy, horse and harness from Longmore's, and of the two horses from Tisdale's corral (evidence of which was introduced without objection), evidence that they had entered the store and provided themselves with food to eat and clothes to wear in their onward flight from the scene of their crime was admissible as one of the circum-

stances of their flight. The things taken from the Irving store were in aid of the attempt to escape from arrest and to facilitate the effort to elude discovery. Wigmore, in his excellent work on Evidence (section 276), says:

"It is to-day universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself."

If one should forcibly break jail, seize a shotgun, and kill an innocent bystander, go to a livery-stable, and take therefrom a saddle and horse upon which to escape, would anyone, in his trial for the murder, question the admissibility of the theft of the horse, and should that horse give out on him in his hurry to escape, and should he break into another stable and take another animal, would not evidence of the last theft be likewise competent as showing conscious guilt? In *People v. Place,* 157 N. Y. 584, 52 N. E. 576, the court said:

"The prosecution was allowed to prove an assault by the defendant upon her husband when he returned home, and when the death of Ida (whom defendant was charged with murdering) could no longer be concealed, unless he was removed or his life destroyed. The demeanor, conduct, and acts of a person charged with crime, such as attempted flight, a desire to elude discovery, an anxiety to conceal the crime, or the evidence of it, are always proper subjects of consideration, as indicative of a guilty mind, and in determining the question of the guilt or innocence of the person charged. (*Greenfield* v. *People,* 85 N. Y. 75 [39 Am. Rep. 636] ; *People* v. *O'Neill,* 112 N. Y. 355, 363 [19 N. E. 796] ; *Pierson* v. *People,* 79 N. Y. 424 [35 Am. Rep. 524] ; *Rex* v. *Clewes,* 4 C. & P. 221; *Reg.* v. *Crickmer,* 16 Cox's Cr. Law Cases, 701; Wills on Circumstantial Ev. p. 67; Roscoe's Cr. Ev. (11th Ed.), p. 18; *People* v. *Hughson,* 154 N. Y. 153, 162 [47 N. E. 1092] ; *People* v. *Ogle,* 104 N. Y. 511, 514 [11 N. E. 53] ; *Hope* v. *People,* 83 N. Y. 418 [38 Am. Rep. 460] ; *People* v. *Barber,* 115 N. Y. 475 [22 N. E. 182] ; *Coleman* v. *People,* 55 N. Y. 81; *People* v. *Murphy,* 135 N. Y. 450 [32 N. E. 138] ; *People* v. *Shea,* 147 N. Y. 79 [41 N. E. 505] ; *Lindsay* v. *People,* 63 N. Y. 143; 154; *Ryan* v. *People,* 79 N. Y. 593, 601; *People* v. *Conroy,* 97 N. Y. 62, 80.) . . . If the defendant, instead of

assaulting her husband to prevent his discovery of the death of his daughter before she effected her contemplated escape, had set fire to the building to avoid detection, there would be no doubt, we apprehend, that evidence of that fact would be admissible. Again, if she had stolen a horse and carriage to aid her in her flight, there would be no doubt that evidence of it should be received.''

In *Crowell* v. *State*, 15 Ariz. 66, 136 Pac. 279, while we held that in that particular case the court erred in admitting evidence of an entirely different and unrelated crime, we announced what seemed to us the rule is with reference to evidence of other crimes than the one for which a defendant is on trial in language quoted from *Towne* v. *People*, 89 Ill. App. 258, as follows:

'' . . . Yet they are all in substantial accord upon the proposition that unless there be some apparent logical connection between the two offenses, either by reason of both being of the *res gestae*, or both being part of one system, or the one tending to show a scienter in the other, the general rule governs, and the exception to it does not apply.''

The attendant circumstances of the flight, such as the means used, as human experience teaches, are often a fair index of the degree of guilt consciously felt.

It is contended that the court erred in admitting evidence on the part of the prosecution of Tomlin's being put in the city jail about the 1st of October, 1913, by the deceased, and in admitting evidence of trouble between Leonard and the deceased some four years before the homicide. This evidence was offered for the purpose of showing motive upon the part of the appellants to commit the crime with which they were charged. It is always permissible to show previous troubles, when in search of the real cause or motive actuating a party to the commission of crime, especially if the trouble is of recent occurrence, or even somewhat remote in time, if it tends to elucidate and throw light on the act constituting the crime or explain the reason of its commission. All the cases, as well as the text-writers, lay down the rule that:

''Where the existence of present malice or premeditation is in issue, evidence of previous quarrels or difficulties between the accused and the deceased is always received if the parties have not become completely and permanently recon-

ciled. . . . It tends to show the existence of animosity be-
tween the parties, and its relevancy results from the fact that
the existence of prior ill feeling not only renders the com-
mission of the crime more probable, but tends to show the
malice or premeditation of the accused. It is immaterial how
remote in time the hostile acts were, as far as the competency
of the evidence is concerned." Underhill on Criminal Evi-
dence, sec. 333.

Evidence of this kind is equally admissible in favor of the
defendant, as well as against him, and in this particular case
Leonard went fully into his difficulties with the deceased, of
which he now complains. The law is so well settled on this
point that we deem it unnecessary to cite further authorities.

In the course of the trial, the county attorney, in answer to
the objection by counsel for appellants to the introduction
of certain evidence, said:

"No; it is not for that purpose at all. It could not preju-
dice these defendants in the eyes of the jury. Nothing could
prejudice them in the eyes of the jury."

There was considerable asperity and feeling shown both
by the county attorney and appellants' attorneys on more
than one occasion, and the court not infrequently, in the
course of the trial, was compelled to admonish, if not repri-
mand, the attorneys of both sides. When this particular re-
mark was made, the county attorney was endeavoring to in-
troduce evidence which he contended would show that the
appellants had been several days preparing to take the life of
Peterson. The evidence, however, was rejected by the court.
If the language used by the county attorney was in a case
fraught with uncertainty or doubt as to the persons who com-
mitted the crime or justification for such crime, we would
hesitate to announce that it was not harmful; but under the
facts in this case we cannot see how the appellants could
have been injured by this language.

The appellants undertook to prove that the deceased was
a man of a turbulent and violent character. To rebut this
testimony the prosecution offered the evidence of several wit-
nesses, whose testimony of good character of the deceased was
of a negative nature. The appellants complain of the court's
refusal to strike out such testimony upon their motion. We

agree with Judge Henshaw in *People* v. *Adams,* 137 Cal. 580, 70 Pac. 662, wherein he says:

"The greatest stress, however, is laid upon the ruling" of the court in "admitting the negative testimony of witnesses as to the reputation of the deceased for peace and quiet, and in refusing to strike out this evidence when it was shown that the witnesses in question had not heard the reputation of the deceased for the particular traits in question discussed. But it is a matter of common sense, common observation, and common knowledge that a man's reputation for peace and quiet is seldom a matter of discussion until some alleged breach of the law calls up its consideration."

All of these witnesses who testified to the general reputation of the deceased for peace and quietude had lived in the same community with him a great number of years, some as long as 30 years, and the fact that they had never heard his reputation in that respect questioned would seem to be the very best possible evidence.

Complaint is made that the court submitted to the jury erroneous instructions, and that he refused certain instructions requested by the appellants. We have carefully examined all of the instructions of the court, and are unable to discover that any error was committed in the instructions given to the jury; and, as to the instructions refused, they were fully covered by other instructions given upon the same points declaring the law applicable.

After a careful and thorough consideration of the evidence submitted in the case and of the errors assigned and complained of, we are satisfied that the appellants were granted a fair hearing, and that we ought not to disturb the verdict of the jury or the sentence of the court pronounced thereon. Judgment is affirmed and judgment is hereby ordered entered, fixing the time when the original sentence of death shall be executed, as required by section 1177 of the Penal Code of Arizona of 1913.

FRANKLIN, J., concurs.

CUNNINGHAM, J., Dissenting.—I am convinced that the trial court erred in receiving evidence of circumstances of the commission of larcenies and burglary by the defendants in

the course of flight from the scene of the homicide to the place of arrest. Such evidence is incompetent, because it is not of a character to throw light on the issue of murder on trial, within the general rule announced by this court in the case of *Crowell* v. *State,* 15 Ariz. 66, 136 Pac. 279. The exceptions to the rule are mentioned in the *Crowell Case,* and the facts of this record do not place this case within any of those exceptions.

I am of the opinion the evidence of the circumstances of the commission of the other crimes committed subsequent to the homicide could have no other effect than that of prejudicing the rights of the accused, particularly after the accused admitted the facts of their connection with the homicide and their flight. The circumstances of the acts of larceny and burglary and the ownership of the property injured could have no effect of throwing light upon or elucidating the issue of murder, or of establishing defendants' guilt.

For this reason, I am of the opinion the judgment should be reversed and the cause remanded for a new trial.

On evidence of other crimes in prosecution for murder, see note in 62 L. R. A. 200, 227, 278, 308, 320.