# Court of Appeals.

January 10, 1899.

## PEOPLE v. MARTHA PLACE.

1. CRIMINAL LAW—CIRCUMSTANTIAL EVIDENCE.

Homicidal suffocation is a crime which it is always difficult to detect, and the mere physical conditions of the body after death, as distinct and satisfactory indications of the fact, will seldom exist. Therefore, resort must be had to collateral proof to show that the death was not the result of natural or accidental causes, and to show circumstances which point to the real causes, and the means employed to effect it. In the administration of the criminal law the people are generally required to rely to a great extent upon the collateral circumstances which point to the crime and the perpetrator of it.

2. SAME.

The question, however, whether the testimony of the people's experts is to be believed, or that given by the defendant's expert is true, is to be determined by the jury alone.

3. SAME.

While to justify a conviction for a crime upon circumstantial evidence, there must be positive proof of the facts from which the inference of guilt is to be drawn, and inference must be shown to be the only one that can be reasonably drawn from the facts, yet, where the evidence, taken together, leads irresistibly and exclusively to a conclusion of guilt, with which no material fact to establish it is at variance, it constitutes the higher form of evidence, and may not be disregarded by court or jury.

4. SAME—CONVICTION.

To justify a conviction, the prosecution is required to establish the death of the person killed and the fact of killing by the defendant as alleged in the indictment. The former is required to be established by direct proof, and the latter beyond a reasonable doubt.

5. APPEAL—QUESTIONS FOR JURY.

In determining whether a new trial should be granted under its provisions, it is not the province of the court of appeals to review and determine controverted questions of fact arising upon conflicting evidence, but that the jury is the ultimate tribunal in such a case, and with its decision the court may not interfere, unless it reaches the conclusion that injustice has probably been done.

6. SAME.

In examining the question whether a new trial should be granted upon the ground that justice requires it, it is the duty of the court of appeals to assume the existence of the facts as they are established by the finding of the jury.

**7. EVIDENCE—MOTIVE.**

Evidence, which discloses the existence of jealousy and a desire of revenging real or fancied wrongs, may be held sufficient to justify the jury in finding a motive for the commission of the offense of murder.

**8. SAME—SIMILAR CRIMES.**

The commission of one crime is not admissible in evidence upon the trial for another, where its sole purpose is to show that the defendant has been guilty of other crimes, and would, consequently, be more liable to commit the offense charged. But if the evidence is material and relevant to the issue, it is not !inadmissible because. it tends to establish the defendant's guilt of a crime other than the one charged.

**9. SAME—MOTIVE.**

The demeanor, conduct and acts of a person charged with crime, such as attempted flight, a desire to elude discovery, an anxiety to conceal the crime, or the evidence of it, are always proper subjects of consideration, as indicative of a guilty mind, and in determining the question of the guilt of innocence of the person charged.

**10. APPEAL—REVIEW.**

As a general rule, to entitled a party to review the rulings of a trial court upon the question of admitting or rejecting evidence, there must have been a proper objection taken to the evidence when offered, and an exception to the ruling made thereon.

**11. SAME.**

The decision of a trial judge overruling a mere general objection to evidence will be sustained on appeal, unless it clearly appears that there is some ground of objection which could not have been obviated if it had been specified, or unless the evidence called for was in any aspect of the case incompetent.

APPEAL from judgment convicting defendant of murder in first degree.

On March 18, 1898, the defendant was indicted for the crime of murder in the first degree. It was alleged in the indictment that she deliberately, with premeditation, and from a deliberate design to effect the death of Ida Place, smothered and asphyxiated her, by forcibly placing, pressing, and holding over against and upon the head, face, mouth, and nose of Ida Place, so that she was unable to breathe and inhale air, certain bedclothing, bedquilts, pillows, and other articles, by reason and in consequence of which the said Ida Place, of such smothering and asphyxiating, died in the borough of Brooklyn on February 7, 1898. To this indictment the defendant pleaded not guilty,

and the issue thus joined was brought on to trial before the county court of Kings county, and resulted in a verdict of murder in the first degree. Thereupon a judgment of conviction was entered, and the defendant was sentenced to the punishment of death, in the manner and at the place prescribed by law. From the conviction, sentence, and judgment the defendant appealed to this court.

Robert Van Iderstine, for appellant.

Robert H. Elder, for the People.

MARTIN, J.—In the month of August, 1893, the defendant became the housekeeper of William W. Place. At that time the family of Mr. Place consisted of himself and his daughter Ida, who was about fourteen years of age. Three months afterwards the defendant and Place were married. Anterior to the marriage the relations between the defendant and Ida were pleasant, and continued so until about a year afterwards. From that time, however, until the homicide, their relations were unfriendly, and quarrels frequently occurred. Dissensions also arose between the defendant and her husband, growing out of the disagreement between his wife and daughter. On one occasion, when her husband unexpectedly returned to his house after starting for his place of business, he found the defendant chasing Ida around the rooms, and when he remonstrated with her she said: "You better keep her out of my way, or I will do her up." Upon another occasion she said to him : "You had better keep her out of my sight. I have warned her. Let her beware." Their relations finally became so unpleasant that, during a portion of the time before the homicide, Ida was boarded by her father away from their home. On Saturday morning, February 5, 1898, the defendant asked her husband for her monthly allowance of $20, which he refused, and a quarrel ensued. Upon the next day she again asked for it, and he again refused. In the morning of Monday, which was the day of the homicide, just before her husband left for his place of business, the defendant said to him : "I want my money. I am going down town." To which he replied : "I

shall not give you that money. I have said to you plainly
what I mean, and I intend to stand by it this time." To this
she answerd : "If you don't give it to me, I will make it cost
you ten time more." He then spoke to his daughter, and kissed
her good-by. He bade his wife good-by, but did not kiss her.
As he passed her in going from the house, she said something
which he did not understand. Shortly after he left, the de-
fendant went into the back parlor, where Ida was sitting; and
a conversation occurred as to family difficulties, during which
Ida declared her intention to go away and not return. The de-
fendant ask her if her father gave her money that morning, to
which she replied, "None of your business." The defendant
then remarked, "When he gives you money, he won't give me
any," to which Ida answered, "That is nothing to you," and
picked up a cigarette box and threw it at the defendant, who
then "went for her." Ida again declared her intention to leave
and not return, and then went up stairs. A few minutes later
the servant of the family, who was in the back yard, heard a
loud scream, which sounded like a woman's. She went into
the kitchen, then into the hall, and opened the door to the stair-
way, when she heard sounds like doors being locked and some
one screaming on the top floor. It stopped while she was
listening, and she paid no further attention to it. After this Ida
was never seen alive, unless by the defendant. This occur-
rence took place at about a quarter after 8 o'clock. At nearly
9 o'clock the defendant called the servant to her room on the
top floor, told her she was going to give up the house, and that
she would have to leave. She then paid her her wages, and five
dollars in addition, as she had given her no notice of her dis-
charge. Later she asked the servant to get an expressman to
take her trunk to the station, to buy her postage stamps, and
to go to the bank and get her bank book. The servant obtained
the stamps and bank book, and took them to the de-
fendant, who was then in her room. She also procured an ex-
pressman to take the defendant's trunk to the station or ferry.
Although the servant expressed a desire to remain another day,
to do the washing and ironing, the defendant requested her to
leave the house before Mr. Place came home; saying that she

did not want her to remain, because when he came he might ask her questions. At about 12 o'clock she requested the servant to buy her a ticket for New Brunswick, which she did; leaving the house for that purpose at about half-past 12. She first told her she was going on the 3:15 train, but afterwards that she was going at another time. Her instructions to the servant were that, if any one rang the bell and asked for Ida, to say she had gone down town; and persons who called at the house in the afternoon were not admitted. The servant did not see Ida after Mr. Place left the house in the morning. She went from the house at about 5 o'clock in the afternoon, leaving the defendant there alone. The defendant told her that she was going to leave Mr. Place, because he had hurt her, and she could not stand it. During the afternoon the defendant wrote Mrs. McArran, "I will make you a present of my rubber plant and bicycle." That letter was received at half-past three, and Mrs. McArran soon after called at the house. She rang the bell twice, but no one came to the door. She then went to an adjoining house, rang the bell, and while waiting there the defendant's servant came out. When she saw her she went to the basement, and then asked to see Mrs. Place. Afterwards the latter came from the kitchen to the dining room, where Mrs. McArran was standing, and said she would see her in a moment; that they were hurrying to get away before Mr Place came home. Mrs. McArran then said, "I received your letter and came up see what was the trouble." To this the defendant replied, "We had more trouble this morning, and I am going to leave him this time for good," and added that she wanted Mrs. McArran to have her bicycle. She finally said she was going to New Brunswick, and, when Ida was asked for, she replied, "He is boarding Ida out, and she hasn't been in to-day." Mrs. McArran then took the wheel and left the house, having seen no one except the servant and the defendant. During the the afternoon, when the bell rang, the defendant told the servant not to go to the door.

The defendant's husband returned home about half past 6 p. m. As he entered the hallway he hung his coat and hat upon the rack, and started towards the back parlor, when he heard a

noise at the head of the stairs, and saw the defendant coming down. As he stood there he almost immediately received a blow upon his head from a hatchet or ax in her hands, and soon received a second blow upon the side of his head. He cried out, and made an effort to reach the front door. While passing along the hallway he received a third blow upon his hand. He reached the door, cried " Murder ! " when some one came to his assistance, and he was taken to a neighbor's house, and from there to a hospital. Thereupon several persons entered the house. Upon going to the third story, they found Ida in her room, lying dead upon her bed. Her face was partially downward, with the head towards the foot of the bed. There was no clothing upon it, except a sheet and pillow, which were under her head or body. The other bedclothing lay in a pile upon the floor between the foot of the bed and the wall of the room. The body lay straight, one arm under the head, and the cheek resting upon the arm. No wounds were found upon the throat, or any portion of the head or body, except a small spot which was discovered upon the temple when the scalp was removed. This was not observable from the outside. Blood was oozing from her mouth, and there was a little upon the pillow or bedclothes. The body was cold and rigid, and the eyes discolored. The skin was redder than was natural although not blistered. The eyes were burned so that the pupils were of a bluish color, and there was some discoloration around the mouth and the right side of the cheek. One of the chairs in the room was broken. The defendant was in the front room, lying upon the floor, with bedclothes over her head, and the gas was escaping into the room from two burners which she had torn down. When subsequently asked why she had turned on the gas, she replied that she wanted to kill herself; that she wanted to die. When found, she seemed unconscious, and was carried into the parlor below. The officers who discovered her attempted artificial respiration, and continued their efforts until the ambulance surgeon arrived and took charge of her. Upon a subsequent examination no external marks of violence was found upon the body of the decedent, except her face was congested, livid, puffed, swollen, and

her eyes were partially open, the cornea protruding slightly, and there were crystals in the outer portion. Her lips were puffed and swollen, and there was considerable froth and blood-stained mucous between the lips and under the upper lip. Her tongue protruded between her teeth, which were slightly apart. The white of her eye had a dull blue-grayish cast. The organs of the body were found to be fairly healthy, with the exception of the eyes. There was a suffused condition of the skin of the face, and larynx, pharynx, and trachea were blue and congested. The brain was normal. The lungs, the heart, and all the organs of the body were healthy, except the eyes, which had been disturbed by some corrosive fluid or acid, causing a hardening or flattening of them so that their convexity had entirely disappeared. The dark portion of the eye was darker, and the white was also darkened. The lower lip was corroded. Under the scalp on the left temple was found a place about the size of a silver dollar which was discolored, and which was proved to have resulted from violence of some kind. An expert called by the people testified that the cause of the decedent's death was asphyxia; that she was blind before her death, which was occasioned by some corrosive substance; that the existing condition of the mouth, throat, tongue, trachea, larynx, and pharynx was produced by violence, and could not have occurred from any other cause. The proof disclosed that the defendant's husband had in his desk in the house both pyrogallic and muriatic acid, that they were the only acids there, and that either would destroy the sight when thrown into the eye.

After her arrest, the defendant admitted in the presence of several officers and the matron of the prison in which she was confined that she had trouble with her husband on the morning of the day of the homicide; that Ida was in the back parlor with her father, and that she knew they were talking about her; that after her husband left she went upstairs, got a white powder out of his desk, put in a glass, filled it with water, went to the door of Ida's room, asked why she was making so much trouble in the house, and, upon her replying that she was not making any more trouble than the defendant was, threw the contents of the glass into her face; that afterwards, and in the afternoon of

that day, she went downstairs, saw an ax, brought it up with her, and gave as a reason for doing so that she knew her husband would " go for her " when he came home, and she wanted something with which to defend herself. When an ax in the possession of one of the detectives was shown her, and she was asked if that was the ax, she replied : " Yes; I think so. I thought it was smaller,"— and afterwards stated that she threw it out of the bedroom window into the yard. As a witness upon the trial, the defendant admitted having gone to her husband's desk and obtained what she said were salts, which were in a blue bottle, and used for headache ; that she put them in a glass, filled the glass with water, and, after having some words with Ida, she threw the contents in her face. She also testified that she desired to leave the house before the return of her husband, for the reason that, if she did not, he would not let her go. She was afraid he would lock the door and keep her in the house. After she was taken to the jail she wrote another letter to Mrs. McArran, which contained the following : " My Dear Friend : The horrible news is circulated. I should prefer death to it. Through Will's threatening I was driven to desperation. But enough. I say no more about it."

The testimony of the witnesses called by the prosecution, when supplemented by the admissions of the defendant and the other proof given on the trial, was sufficient to establish the existence of the foregoing facts and circumstances beyond a reasonable doubt. While there was a conflict in the evidence, still, whether the transaction and circumstances were as claimed by the prosecution, or were as testified to by the defendant and her witnesses, was clearly a question for the jury. This is so, not only as to what transpired, but also as to the expert evidence relating to the cause of the decedent's death, and the correctness of the premises upon which the conclusion of the people's experts rested. Although the condition of the body of the decedent, as described by the witnesses who saw it after death, presented most of the post mortem appearance of death by suffocation as they are laid down by various writers upon medical jurisprudence, yet it is said that the proof of the conditions of her body did not clearly establish the cause of death. But it

must be remembered that homicidal suffocation is a crime which it is always difficult to detect, and the mere physical conditions of the body after death, as distinct and satisfactory indications of the fact, will seldom exist. Therefore resort must be had to collateral proof to show that the death was not the result of natural or accidental causes, and to show circumstances which point to the real cause, and the means employed to effect it. In the administration of the criminal law the people are generally required to rely to a great extent upon the collateral circumstances which point to the crime and the perpetrator of it. If the medical testimony of the prosecution was believed, the jury was justified in relying upon it in determining the issues in this case. Here, as is usual in cases where expert evidence is given, the defense called an expert, whose testimony, if true, tended to show that but little reliance was to be placed upon the testimony of the experts called by the prosecution. The question, however, whether the testimony of the people's experts was to be believed, or that given by the defendant's expert was true, was to be determined by the jury alone. Therefore, in the further examination of this case, we must assume that the foregoing facts and circumstances were properly established, and upon their sufficiency to justify it the conviction in this case must stand or fall.

The appellant insists that in considering the question of the sufficiency of the proof, and the inferences to be drawn from it, the doctrine of the case of People v. Harris, 136 N. Y. 423, 33 N. E. 65, should be applied. In that case it was, in effect, held that while, to justify a conviction for a crime upon circumstantial evidence, there must be positive proof of the facts from which the inference of guilt is to be drawn, and that inference must be shown to be the only one that can be reasonably drawn from the facts, yet where the evidence, taken together, leads irresistibly and exclusively to a conclusion of guilt, with which no material fact to establish it is at variance, it constitutes the higher form of evidence, and may not be disregarded by court or jury. We recognize this as a proper statement of the law which is applicable in this case. Applying the doctrine of that case to the facts and circumstances in this, it seems quite obvious that they

justified the jury in finding the defendant guilty of the crime charged. To justify a conviction, the prosecution was required to establish the death of the person killed, and the fact of killing by the defendant, as alleged in the indictment. The former is required to be established by direct proof, and the latter beyond a reasonable doubt. Pen. Code, § 181. The death of Ida Place was properly established as required by law, so that the only remaining question is whether the proof which tended to show that the defendant killed her was sufficient to justify the jury in finding that fact.

The evidence relied upon to establish the defendant's guilt was circumstantial. It, however, tended to show a motive on the part of the defendant for the commission of the crime, and the means employed were within her reach ; that the opportunity to commit the offense existed ; that she alone was in a position to have committed it; that she made false statements as to the presence of the decedent in the house; that she made preparations for flight, and had recourse to fraud and misrepresentation to conceal the death of the decedent; that she attacked her husband upon his return, to avoid discovery and prevent his interfering with her escape; that she admitted an attack upon the decedent by which she destroyed her eyesight; and that she attempted to take her own life. This proof points with almost unerring certainty to the defendant as the prepetrator of the crime charged. All the circumstances and proof in the case are not only consistent with her having killed her husband's daughter, but are inconsistent with any other conclusion. Therefore, after a thorough study of the evidence contained in the record, and a careful consideration of the facts and circumstances disclosed, we are led irresistibly to the conclusion that the verdict of the jury was fully justified.

· The defendant contends that in examining this case the evidence of Dr. Henderson should be entirely disregarded. We know of no principle or rule of law which would justify us in disregarding that evidence. He was called and sworn as a witness upon the trial, and while the evidence of an expert called by the defendeant, if credited, would tend to weaken and discredit his evidence in many essential particulars, still the ques-

tion whether his testimony was worthy of credit, or the testimony of the defendant's experts should be believed, was a question for the jury, and one with which this court has no authority to deal.

The appellant also claims that a new trial should be granted under section 528 of the Code of Criminal Procedure. That section provides, "When the judgment is of death, the court of appeals may order a new trial, if it be satisfied * * * that justice requires a new trial, whether any exception shall have been taken or not in the court below." That provision of the statute has been several times under consideration, and this court has, with singular uniformity, held that, in determining whether a new trial should be granted under its provisions, it is not its province to review and determine controverted questions of fact arising upon conflicting evidence, but that the jury is the ultimate tribunal in such a case, but that the jury is the ultimate tribunal in such a case, and with its decision the court may not interfere, unless it reaches the conclusion that injustice has probably been done. People v. Cignarale, 110 N. Y. 23, 26, 17 N. E. 135 ; People v. Trezza, 125 N. Y. 740, 26 N. E. 933 ; People v. Kelly, 113 N. Y. 647, 21 N. E. 122 ; People v. Hoch, 150 N. Y. 291, 44 N. E. 976 ; People v. Youngs, 151 N. Y. 210, 222, 45 N. E. 460 ; People v. Constantino, 153 N. Y. 24, 35, 47 N. E. 37 ; People v. Decker, 157 N. Y. 186, 51 N. E. 1018. Therefore, in examining the question whether a new trial should be granted upon the ground that justice requires it, it is our duty to assume the existence of the facts as they are established by the finding of the jury. When that is done, it becomes extremely difficult to discover any basis upon which we would be justified in holding that a new trial should be granted. The natural, logical, and almost inevitable inferences which arise from the facts and circumstances established by the evidence lead to the conclusion that the decedent's death was occasioned by violent means, and that the violent acts which caused it were prepetrated by the defendant. We think no other reasonable conclusion can be fairly drawn from the evidence contained in the record, and that the defendant is not entitled to a new trial upon that ground.

Another claim of the appellant is that, as the conviction in this case was based upon circumstantial evidence, it was important to establish a motive in the defendant for the commission of the crime, and that the people failed to show any adequate one. While it must be conceded that evidence of a motive had an important bearing upon the question of the defendant's guilt or innocence, yet the claim that no adequate motive was proved cannot, we think, be sustained. An examination of the record discloses that the relations which had existed between the defendant and Ida for several years had been of an unpleasant character, and that quarrels between them had often occurred during that time. It was also proved that upon two occasions, at least, the defendant made threats which indicated a purpose upon her part to injure the decedent; that at times the defendant would not speak to Ida, and would leave the table if Mr. Place entered into conversation with her; that she had hidden her underclothes and destroyed her hat; that she refused her company at the house, and required her to do manual labor for which servants were paid; that upon one occasion, previous to the homicide, Mr. Place had to force the defendant to the floor, to protect himself; and that there would be weeks when she would not speak to her husband. These relations between them arose principally from the fact that Ida retained the affections of her father to a greater extent than did the defendant, or at least she believed such to be the case. Her jealousy seems to have been intense, and to have influenced, if it had not controlled, the actions of her life for several years. One of the usual inducements to crime is the desire of revenging real or fancied wrongs. The existence of such a condition of affairs may well be regarded as evidence of a motive upon the part of the defendant, even for the commission of such a crime. Although no motive would be sufficient to induce a perfectly just person to commit crime, yet the experience of courts has been that often the gravest crimes are induced by slight motives. We think the evidence in this case was sufficient to justify the jury in finding a motive for the commission of the offense.

Another alleged error upon which the defendant relies for a reversal relates to the admission of evidence as to what occurred

between the defendant and her husband upon his return on the
day of the homicide. The contention of the defendant is that
this evidence was inadmissible because it involved proof of one
crime to establish the defendant's guilt of another. It is an
elementary principle of law that the commission of one crime
is not admissible in evidence upon the trial for another, where
its sole purpose is to show that the defendant has been guilty
of other crimes, and would consequently be more liable to com-
mit the offense charged. But if the evidence is material, and
relevant to the issue, it is not inadmissible because it tends to
establish the defendant's guilt of a crime other than the one
charged. People v. McLaughlin, 150 N. Y. 365, 386, 44 N. E.
1017. The prosecution was allowed to prove an assault by the
defendant upon her husband when he returned home, and when
the death of Ida could no longer be concealed unless he was
removed or his life destroyed. The demeanor, conduct, and
acts of a person charged with crime, such as attempted flight, a
desire to elude discovery, an anxiety to conceal the crime or
the evidence of it, are always proper subjects of consideration,
as indicative of a guilty mind, and in determining the question
of the guilt or innocence of the person charged. Greenfield v.
People, 85 N. Y. 85; People v. O'Neill, 112 N. Y. 355, 363,
19 N. E. 796; Pierson v. People, 79 N. Y. 424; Rex v. Clewes,
4 Car. & P. 221; Reg. v. Crickmer, 16 Cox, Cr. Cas. 701;
Wills, Circ. Ev. p. 67; Rosc. Cr. Ev. (11th Ed.) p. 18; People
v. Hughson, 154 N. Y. 153, 162, 47 N. E. 1092; People v.
Ogle, 104 N. Y. 511, 514, 11 N. E. 53; Hope v. People, 83
N. Y. 418; People v. Barber, 115 N. Y. 475, 22 N. E. 182;
Coleman v. People, 55 N. Y. 81; People v. Murphy, 135 N.
Y. 450, 32 N. E. 138; People v. Shea, 147 N. Y. 79, 41 N. E.
505; Linsday v. People, 63 N. Y. 143, 154; Ryan v. People,
79 N. Y. 593, 601; People v. Conroy, 97 N. Y. 62, 80. In
Pierson v. People, supra, where there was an intimacy between
the prisoner and the wife of the decedent before and after his
death, and the former disappeared eleven days afterwards, a
clergyman was called as a witness, and testified that the prisoner
and the wife of the decedent called at his residence some days
after the homicide, and that he married them, after the prisoner

stated under oath that there was no legal objection to his being married, and this court held that the evidence was competent, although it tended to prove another crime than that charged in the indictment. In Rex v. Clewes, A. was indicted for the murder of H. It was claimed that A., having malice against P., hired H. to murder him, which he did, but that, H. being detected, A. murder H. to prevent the discovery of A.'s guilt respecting the murder of P. ; and it was held that the prosecutor might give evidence of the murder of P. Wills, in his work on Circumstantial Evidence, says : "Instances of killing to conceal other crimes are frequent, and evidence of the murder of one person may be given in evidence upon a trial for the murder of another, if such evidence tend to show that the prisoner might have had a motive arising out of the other murder for committing that with which he was charged." Without further examination of the authorities cited, it may be said that they establish a principle which sustains the ruling in this case. If the defendant, instead of assaulting her husband to prevent his discovery of the death of his daughter before she effected her contemplated escape, had set fire to the building to avoid detection, there would be no doubt, we apprehend, that evidence of that fact would be admissible. Again, if she had stolen a horse and carriage to aid her in her flight, there would be no doubt that evidence of it should be received. The jury may well have found that the purpose of her assault was to kill her husband, and thereby prevent a discovery of her crime until she had an opportunity to escape. We find no error in the reception of that evidence which would justify a reversal of the judgment.

Upon the trial William W. Place was called as a witness. After proving by him that the relations between the defendant and Ida were pleasant until the fall of 1894, he was asked this question : "Since the fall of 1894, what has been the general feeling, as you have observed it, between Mrs. Place and your daughter, Ida?" This was objected to, but without stating any grounds of objection. The objection was overruled, and the defendant excepted. The witness answered : "Seemed to be a general feeling of malice and hatred towards my daughter;

denying her many privileges ; denying her all home comforts."
He then testified that as a rule his wife did not speak to his
daughter in his presence, except on very rare occasions, and
gave in detail evidence of facts and circumstances tending to
show that the defendant entertained feelings of malice and
hatred towards her.    He testified as to their quarrels, and the
manner in which the defendant treated Ida, including the threats
she made.    The appellant now insists that the admission of
that evidence was error, as the witness was allowed to charac-
terize and give his opinion as to a series of actions, conversa-
tions, and course of conduct between two persons, other than
himself, extending over a period of years.    In the first place,
it is to be observed that no such grounds of objection were
stated.    The attention of the court was in no way called by any
objection to the form of the question, or to the fact that it in-
volved a conclusion or opinion.    The objection was simply
general, and such as would naturally lead to the belief that it
was intended to merely raise the question of the admissibility
of evidence showing the relations which existed between the de-
fendant and Ida.    Such evidence was competent as bearing
upon the question of the defendant's motive, and, if she desired
to object to the form of the question, her objection should have
plainly stated that ground.    It is at least doubtful if at the trial
the defendant's counsel had in view the question which he now
raises as to the admissibility of the evidence.    As a general rule,
to entitle a party to review the rulings of a trial court upon the
question of admitting or rejecting evidence, there must have
been a proper objection taken to the evidence when offered, and
an exception to the ruling made thereon.    It is well-settled law
that the decision of a trial judge overruling a mere general ob-
jection to evidence will be sustained on appeal, unless it clearly
appears that there is some ground of objection which could not
have been obviated if it had been specified, or unless the evi-
dence called for was, in any aspect of the case, incompetent.
Quinby v. Strauss, 90 N. Y. 664.    Applying this rule to the
question under consideration, we are of the opinion that the
objection taken was not sufficient, and the defendant's excep-
tion to the ruling does not present the question which he now

argues. Moreover, it is obvious that no substantial rights of the defendant were prejudiced by the reception of this evidence. Its manifest purpose was to show the relations between the defendant and Ida, and that was done by proof of their specific acts, conversations, and declarations. Although the question objected to was answered, it is manifest that the facts upon which the answer was based were given, and that the jury must have understood the answer as based upon those facts alone. We find no error in this ruling which would justify a reversal under the provisions of the Code of Criminal Procedure, which requires us to give judgment on appeal without regard to technical errors or exceptions which do not affect the substantial rights of the parties.

Another exception relied upon by the appellant was to the evidence of Henry V. Walker, a chemist, who analyzed the contents of the two bottles that were in the desk of Mr. Place, where the defendant went to obtain the powder which she dissolved and threw into the eyes of the decedent. We think this evidence was properly admitted. The proof showed that the defendant's husband kept in his desk muriatic and pyrogallic acid; that she went there, and obtained a powder from one of these bottles, which she admitted was acid; that she dissolved it, and threw the contents into the face of the decedent. We think this proof was sufficient to justify the prosecution in showing the character of the acids which were in her husband's desk. The purpose of the proof was to show that the defendant had the means of committing one of the acts which attended or preceded the homicide, and which may have induced it.

The defendant also insists that the court erred in the following portion of its charge to the jury: "It is provided by our statute that no person can be convicted of murder or manslaughter, unless the fact of the killing, and the fact that it was by the agency of the defendant, are each established as independent facts; the killing by direct evidence, the latter beyond a reasonable doubt. I do not understand, from the position of learned counsel, that the fact that on the 7th day of February, 1898, Ida Place met her death in some way, is questioned; so that may be taken as a conceded fact in the case. Thus, you

are brought, at the threshold of this case, to the consideration of the question which underlies it all, and that is, what was the cause of death? Was it asphyxiation, or was it a death from natural causes? The people say it was asphyxiation. The defendant denies it. The people have produced testimony in the shape of the statement of Dr. Henderson, who says positively it was a case of asphyxiation. They have produced testimony of the circumstances that attended the finding of the body, the condition of the body, color of the face, the general appearances; and all these things they say indicate beyond a reasonable doubt that this was a case of asphyxiation. On the other hand, the defendant maintains that the evidence shows no such thing; that it does not show the cause of death; that it does not show it was a violent death, or anything other than a natural death. So at the outset it is for you to say, on this evidence, was this a death from asphyxiation or not? If you conclude, on this evidence, that it was a case of death from asphyxiation or suffocation, then you come to the other questions in the case, namely-did this defendant cause the death of Ida Place, and, if she did, under what circumstances did she do it?" We find no exception to this portion of the charge, nor are we able to discover any error in it which would justify us in disturbing the judgment.

Having thus examined all the questions raised upon this appeal, and finding none sufficient to justify a reversal of the judgment, it follows that it should be affirmed.

All concur, except GRAY, J., absent.

Judgment of conviction affirmed.