THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* BENJAMIN FELDMAN, Appellant.

Argued October 9, 1946; decided January 16, 1947.

128

*John McKim Minton* and *Rudolph Stand* for appellant.
I. The trial court committed prejudicial error in receiving evidence that the death of defendant's mother-in-law was accom-

panied by the identical symptoms exhibited by defendant's wife during her fatal illness and that both died the same way. (*People* v. *Buffom*, 214 N. Y. 53; *People* v. *Molineux*, 168 N. Y. 264; *People* v. *Conrow*, 200 N. Y. 356; *People* v. *Kennedy*, 164 N. Y. 449; *People* v. *Friedman*, 205 N. Y. 161; *People* v. *Powell*, 223 Mich. 633; *People* v. *Razezicz*, 206 N. Y. 249; *People* v. *Harris*, 209 N. Y. 70; *People* v. *Loomis*, 178 N. Y. 400; *Boyd* v. *United States*, 142 U. S. 450; *Chaffner* v. *Commonwealth*, 72 Pa. 60; *People* v. *Collins*, 144 Mich. 121; *People* v. *Argentos*, 156 Cal. 720.) II. The People failed to establish beyond a reasonable doubt that the strychnine poisoning from which the deceased died in the hospital resulted from any act or agency of the defendant. (*People* v. *Harris*, 136 N. Y. 423; *Speights* v. *State*, 41 Tex. Cr. App. 323.) III. It was a question of fact for the jury to determine whether or not a particular medicine bottle contained poison and the People's experts were erroneously allowed to express their opinions on that subject. (*People* v. *Taddio*, 292 N. Y. 488; *Ferguson* v. *Hubbell*, 97 N. Y. 507; *People* v. *Grutz*, 212 N. Y. 72; *People* v. *Creasy*, 236 N. Y. 205; *Donner* v. *Delaware & H. Canal Co.*, 164 Pa. 17; *People* v. *Barber*, 115 N. Y. 475.) IV. The trial court usurped the province of the jury in his argumentative instructions on the doctrine of reasonable doubt, and the charge as a whole inadvertently assumed the form of an advocate's argument for conviction. (*People* v. *Odell*, 230 N. Y. 481; *Weare* v. *United States*, 1 F. 2d 617; *People* v. *Ohanian*, 245 N. Y. 227; *Wallace* v. *United States*, 291 F. 972; *Adler* v. *United States*, 182 F. 464; *Paddock* v. *United States*, 79 F. 2d 872.) V. Defendant's guilt was not established beyond a reasonable doubt and his conviction rests upon circumstantial evidence which failed to meet the test imposed by law for that kind of evidence. The evidence completely failed to show that defendant had a motive to murder his wife. (*People* v. *Weiss*, 290 N. Y. 160; *People* v. *Fitzgerald*, 156 N. Y. 253; *People* v. *Bennett*, 49 N. Y. 137; *People* v. *Lewis*, 275 N. Y. 33; *People* v. *Fielding*, 158 N. Y. 542; *People* v. *Esposito*, 224 N. Y. 370; *People* v. *Giordano*, 213 N. Y. 575; *People* v. *May*, 290 N. Y. 369; *People* v. *White*, 176 N. Y. 331; *People* v. *Weiss*, 290 N. Y. 160; *People* v. *Taddio*, 292 N. Y. 488.)

*Miles F. McDonald, District Attorney, Kings County* (*Henry J. Walsh* of counsel), for respondents. I. Decedent's sister's

testimony was competent, relevant and material. It is one of the most potent factors denoting appellant's guilt. (*People* v. *Conroy,* 97 N. Y. 62; *People* v. *Place,* 157 N. Y. 584; *People* v. *Willett,* 213 N. Y. 368; *People* v. *Smith,* 180 N. Y. 125; *People* v. *Harris,* 136 N. Y. 423.) II. Nor was the testimony proof of, or an attempt by indirection, to prove another crime, The trial court made plain to the jury that it was not to consider decedent's sister's testimony of such a character. (*People* v. *Barnes,* 202 N. Y. 77; *People* v. *Wagner,* 245 N. Y. 143; *People* v. *Lewis,* 238 N. Y. 1; *People* v. *Rodawald,* 177 N. Y. 408; *People* v. *Nitzberg,* 287 N. Y. 183; *People* v. *Rogers,* 192 N. Y. 331.) III. Appellant's criminal agency was proved beyond the shadow of a doubt. (*People* v. *Crowley,* 102 N. Y. 234; *Kay* v. *Metropolitan Street R. Co.,* 63 App. Div. 187; *People* v. *Place,* 157 N. Y. 584; *People* v. *Hoch,* 150 N. Y. 291.) IV. The jury's province was not invaded by the expressions of the experts' opinions. (*Dougherty* v. *Milliken,* 163 N. Y. 527; *Noah* v. *Bowery Savings Bank,* 225 N. Y. 284; *People* v. *Youngs,* 151 N. Y. 210; *People* v. *Monat,* 200 N. Y. 308.) V. The court's charge on reasonable doubt was a fair exposition of the subject and could not have left any impression on the jury that the court was endeavoring to influence it. (*People* v. *Guidici,* 100 N. Y. 503; *Newall* v. *Bartlett,* 114 N. Y. 399; *People* v. *Katz,* 209 N. Y. 311; *Brotherton* v. *People,* 75 N. Y. 159; *People* v. *Radcliffe,* 232 N. Y. 249; *People* v. *Bonifacio,* 190 N. Y. 150; *People* v. *Bennett,* 49 N. Y. 137; *People* v. *Harris,* 136 N. Y. 423; *People* v. *Razezicz,* 206 N. Y. 249.) VI. The verdict rests upon a sound substantial basis. (*People* v. *Soper,* 243 N. Y. 320; *Hendrickson* v. *People,* 10 N. Y. 13; *People* v. *Sutherland,* 154 N. Y. 345.)

LEWIS, J. The defendant stands convicted of murder in the first degree upon an indictment which charges that — " * * * on or about the 7th, 8th and 9th days of December, 1943, in the County of Kings, [the defendant] wilfully, feloniously and of malice aforethought poisoned Harriet Feldman, by giving and administered (*sic*), to her a quantity of poison, to wit, strychnine, and as a result of said poisoning said Harriet Feldman died on December 9, 1943."

A close examination of the record has led us to conclude that errors occurred upon the trial the cumulative effect of which

may well have led to the judgment of conviction and thus prejudiced the defendant's rights. In connection with the following summary of evidence the fact should be noted that the judgment of conviction rests upon circumstantial evidence — "a process of decision by which a court or jury may reason from circumstances which are known or proved, to establish by inference the reality of the principal fact." (*People* v. *Taddio*, 292 N. Y. 488, 489.)

The defendant is a pharmacist who for a period of years had been employed at a drugstore operated by the witness Hyman Ruvinsky at 622 Livonia Avenue in Brooklyn. He married the decedent in 1940 when she was twenty years old and he was thirteen years her senior. Although the record does not tell us whether during the three years of their life together a child was born of the marriage, it does appear that the decedent was pregnant at the time of her death and that her pregnancy was not accompanied by unusual illness.

At about nine o'clock on the night of December 7, 1943, when the defendant was on duty at his place of business and the decedent was alone in their apartment she was called upon by her sister, Mrs. Theresa Kushner. At that time there were no indications that the decedent was ill. Within an hour after Mrs. Kushner left the decedent the witness Sophie Wiener who lived on the same floor heard a strange noise which led her to open a door leading into the outside hallway. As she did so she saw the decedent standing in the doorway of the Feldman apartment apparently in distress. Upon going to her assistance she noted that the decedent's body had stiffened, her face was drawn, "her eyes were like big saucers, very big, and she kept crunging like that, shivering, her body shaking." Her hands were clenched and drawn in toward her chest and her arms were bent from the elbows. After Mrs. Wiener had summoned by telephone the defendant, the decedent's sister Mrs. Kushner, and the decedent's attending physician, she was aided by two other neighbors in placing the decedent on a bed. Although the decedent was conscious her legs had stiffened with toes turned in and her hands were in a claw-like position with fingers, wrists and elbows bent. She repeatedly cried out "I'm dying * * * The sooner I die the better * * * Let me die now * * * I'm in terrible pain * * * Don't touch my feet." When the

doctor arrived he found the decedent in a convulsion. Thereafter the defendant arrived at a time when his wife was suffering a second convulsion. According to the doctor's testimony the defendant was " very anxious ", he " wanted to help her ", and urged the doctor to " call a consultant ". When he suggested someone unknown to the doctor the latter suggested " I would like to get my own man, if it is possible." Thereupon the attending physician called in consultation a second physician who arrived when the decedent was suffering a third convulsion. As a result of their consultation the doctors ordered the decedent removed to Beth-El Hospital where she arrived before midnight on December 7th.

At this point in the narrative it should be said that, although the doctors who had been in attendance upon the decedent at her apartment the night of December 7th reached the conclusion (on a later date) that her illness on December 7th had been due to strychnine poisoning, and although the indictment charged that defendant administered strychnine to the decedent " on or about the 7th, 8th and 9th days of December, 1943," the prosecution made no effort by direct or circumstantial evidence to prove that the defendant caused poison in any form to be administered to the decedent on or before December 7th.

Although the hospital chart of December 8th shows that on decedent's first day in the hospital she suffered two convulsions, the attending physicians expressed the opinion that on that day her condition showed improvement. However, in the late afternoon a consultation of three doctors prescribed for her two new types of medication — one was hytakerol, a medicine in tablet form containing a highly concentrated preparation of calcium; the other medicine was a liquid containing calcium chloride and elixir of lactate pepsin. The liquid medicine was to be put up in five or six bottles and administered by giving the patient the contents of one bottle every four hours. Concededly neither of the two medications then prescribed contained a poisonous ingredient which would cause death.

After the prescription for the two new medications had been written upon a single piece of paper one of the doctors handed it to the defendant and said to him: " Mr. Feldman, I think you can get this hytakerol at Jacoff's, and while you are about it you might as well make up the calcium chloride and the elixir

of lactate pepsin there, too.'' With the prescription in hand the defendant left his wife's hospital room accompanied by his brother-in-law who drove him first to Jacoff's drugstore where he purchased the hytakerol tablets. The defendant was then driven to Ruvinsky's drugstore, where he ,was employed, at which place he told his brother-in-law to wait outside. Upon entering the drugstore the defendant spoke of his wife's illness and told his employer and the prescription clerk that he came in to prepare a prescription for her. He then went to the prescription counter in the rear of the store where, after asking the prescription clerk to help him, he prepared the liquid medicine which was put into six 6-ounce bottles.

As to what transpired while the defendant was compounding the prescription the testimony of both the proprietor Ruvinsky and the prescription clerk shows that on that night the drugstore was very busy. While the defendant was at work at the prescription counter the proprietor frequently passed back and forth near him. Meantime the prescription clerk aided him to the extent of preparing labels for the six bottles. In doing so he stood at the defendant's side although he was not present when all six bottles were filled. From Ruvinsky's testimony it also appears that when he first acquired the drugstore there was on hand — kept with other poisons in a small cabinet near the prescription counter — a quantity of powdered strychnine which was '' never used ''; also soluble strychnine sulphate in tablet form known as '' triturate tablets ''. Ruvinsky did not recall that in preparing the prescription the defendant used any utensil to grind strychnine tablets or to dissolve them. There is no evidence that any bottle from the poison cabinet containing strychnine was opened on the night of December 8th; nor is there evidence that the content of any bottle containing strychnine was reduced on that date.

When the defendant had completed preparation of the prescription he returned with his brother-in-law to the hospital and entered his wife's room at about 10:30 P.M. (December 8th). He then delivered the six bottles of '' pinkish '' medicine to the nurse then on duty who placed them on a window ledge with other medicine and promptly administered to the decedent the contents of one of the bottles. Four hours later — at 2:30 A.M. (December 9th) — the nurse next on duty administered to

the decedent the contents of the second bottle of medicine — which medication is claimed by the People to have contained the strychnine which caused decedent's death. At 3:00 A.M. (December 9th) the decedent suffered a convulsion. She died at 4:00 A.M. on that date.

After directing the removal of the body to the hospital morgue the attending nurse disposed of the six bottles which had been brought by the defendant to his wife's room — two of the bottles being empty, the remaining four bottles being full. The disposal thus made of the six bottles was in accord with usual hospital practice where special medication is prescribed for a patient. It is not claimed by the prosecution that the disposal thus made of the bottles was in any way dictated by the defendant. As no chemical analysis was ever made of the contents of any of the six bottles there was no direct proof that any one of them contained strychnine.

The body of the decedent, which had been buried on December 9, 1943, without embalming, was exhumed on May 12, 1944, when a post-mortem examination revealed that her organs contained 3.7 grains of strychnine — an amount three times the minimum lethal dosage.

Omitting reference to evidence introduced by the People to establish that the defendant had a pecuniary motive for bringing about his wife's death; that prior to and since his marriage to the decedent he had enjoyed with another woman a friendship which was something more than platonic; and that consciousness of guilt was established by his alleged false statement on the date of his arrest (July 1, 1945) — that he had not gone to Ruvinsky's drugstore on the night of December 8, 1943 — I pass to the decisive issue which the jury was called upon to consider.

The trial judge charged — " In order for the prosecution to prevail in this case you must find beyond a reasonable doubt that the strychnine poison from which she allegedly died was taken at the hospital and at no other place; for if the prosecution has failed to satisfy you beyond a reasonable doubt that the poison was administered to her after the pinkish medicine was brought to the hospital, the defendant must be acquitted."

The issue of fact thus defined by the trial court was not decided by the jury on direct evidence. The record contains

no direct proof, as we have seen, that there was strychnine in any one of the six bottles of " pinkish medicine " which the defendant had prepared and brought to the decedent's room. The jury's decision rests upon the conflicting views expressed by experts — each of whom concededly was qualified — called by the People and by the defendant on the question as to how long ingested strychnine retains its lethal effect. All the experts agreed — and the prosecution offered no evidence to the contrary — that the decedent's illness on the night of December 7th, before she was removed to the hospital, was due to strychnine poisoning. The experts disagreed, however, upon the decisive point as to whether her death in the early hours of December 9th could have resulted from strychnine which the experts agree was in her system on the night of December 7th. Upon that issue the People's experts stated their opinion to be that the strychnine which caused decedent's death was not ingested before she entered the hospital on the night of December 7th — twenty-eight hours before her death — but was in the bottle from which the last medication was administered to her at 2:30 A.M. on December 9th. Opposed to that view the opinion of experts sworn by the defendant was that the decedent's death on December 9th could have resulted from strychnine ingested by her on the night of December 7th. Indeed, there was testimony by one of the defendant's experts that he had known of a case where a patient took a lethal dose of strychnine and lived for thirty-six hours.

In that state of the record — where the judgment of conviction rests upon the jury's adoption of one of two conflicting views expressed by experts upon a decisive issue of fact — we cannot say that the verdict of the jury was not influenced to defendant's prejudice by permitting the introduction of evidence implying that defendant may have been guilty of killing his mother-in-law as well as his wife.

During the examination of the People's witness, Sophie Wiener, she testified that she had known the decedent's mother, Mrs. Berkowitz. Then occurred the following: " Q. Do you remember when she died? A. Yes. Mr. Kern [attorney for the defendant]: Object to that. The Court: She may state when she died. I won't permit any evidence other than that. Mr. Kern: I withdraw the objection. The Court: All right.

You have heard my ruling, Mr. District Attorney. Mr. Cone [Assistant District Attorney]: I am mindful of that. I won't violate the law. The Court: Remember what I said. Don't go into the mother's death at all. You may prove when she died." Thereafter when the decedent's sister Mrs. Kushner was called by the People it was brought out by her testimony that after the defendant and the decedent were married in 1940 they came to live in the apartment occupied by the decedent's mother, Mrs. Berkowitz. It also appeared that Mrs. Berkowitz died in August, 1941 — about eight months after the defendant and the decedent came to live with her. In the course of Mrs. Kushner's examination she described how on December 8, 1943, the day after her sister had been taken to the hospital, and after the consultation of three doctors had taken place she had seen one of the doctors deliver to the defendant a prescription and that she then left the hospital with the defendant. On their way out she and the defendant met her husband with whom she had a conversation which she described as follows: "I told my husband that they [the doctors] did not know what it was, but they are treating her, and I told him exactly how I found her, and she looked like my mother looked — ".

At that point in her narrative the following colloquy occurred between the court and the witness: "Never mind about your mother. Pass on to something else. Did you hear what I said? You obey the instruction of the court. Remember what I said to you. Leave all reference to your mother out of this case."

In view of prior emphatic instructions by the court relating to references to the decedent's mother and her death, the jury may well have gained the impression that there was something about that particular subject which, under the court's ruling, was not for their ears. However, there came a time when the District Attorney requested a conference with the court. Thereupon, in company with opposing counsel, and after the jury had been excused from the room, the attorneys approached the bench for conference with the court. When that conference had ended and the jury had returned — and without further explanation at that time from the court — the witness Mrs. Kushner was questioned about a conversation she had with the defendant on the day after the decedent's funeral. Counsel for the defendant objected to that line of inquiry and took an exception when the

court — still without explanation — overruled his objection. Then occurred the following: " Q. Now you say you said to the defendant Feldman, ' Momma died that way?' A. Yes, ' and Harriet died that way, and after all, I have two children. Maybe we can find out what it is, and we could go further into the matter. I would not want my two children to be stricken that way,' so he said — Q. Now before that, in the course of your talk to the defendant Feldman, did you have anything to say about feet? A. I said, ' They both cried, " Don't touch my feet " '."

At this point in the examination counsel for the defendant again objected to the testimony. When his objection was again overruled he took an exception. The court then directed the District Attorney to " start all over again ". Thereupon Mrs. Kushner testified: " I said, ' After all,' I said, ' There should have been an autopsy. After all, I am the mother of two children,' and I said, ' they both died the same way; " don't touch my feet ", they cried, and the symptoms were identical,' and I said, ' Maybe we could find out what it is and we can prevent such other occurrences.' So he said, ' Your mother died from a heart attack, and Harriet died from tetany superimposed by pregnancy, and what has one got to do with the other?' I said, ' No it was too identical,' and so he kept saying, ' No, no, no, your mother died from a heart attack, and Harriet died from tetany,' and Dr. Ginsberg was there at that time."

Attempt to justify admission of that testimony as evidence of a consciousness of guilt must fail. There was here no concealment of crime; too many other explanations for defendant's refusal or disinclination to consent to an autopsy render it quite speculative as proof from which the fact of a guilty conscience may be deduced. In any event, the danger of undue emphasis being attached to the testimony outbalances any legitimate probative force it could have had. The vice of the testimony, with special reference to the decedent's outcries " Don't touch my feet ", was that — in the light of other evidence that such outcries were characteristic symptoms of strychnine poisoning — it implied, and the jury were permitted so to conclude, that the decedent and her mother — with both of whom the defendant had lived — had died of strychnine poisoning. The impression thus made upon the members of the

jury was in their minds during the six days of the trial which followed. Then came the summation by the District Attorney in which he said to the jury: "Was the body exhumed at the request of the defendant? Oh, no. No, sir! You remember the conversation about the autopsy? Do you remember the conversation at Mrs. Kushner's house, the night she said to the defendant, 'Mama died that way. Harriet died that way.' * * * They both cried, 'Don't touch my feet!' They had identical symptoms."

At this point in the District Attorney's summation counsel for the defendant interposed an objection and moved for a mistrial which was denied, with exception. Even then the court made no attempt to explain its ruling. However, in his charge to the jury the Trial Judge made the following statement: "The prosecution also points to the testimony of Mrs. Kushner and alleges therefrom that it has been established that shortly after the death of Mrs. Feldman she and the defendant had a conversation, during which she said to the defendant, in substance, that her mother's death was also accompanied by the same symptoms as those exhibited by Mrs. Feldman during her fatal illness; that she said to the defendant that it was imperative that an autopsy upon the body of Mrs. Feldman be performed, in order to determine the true cause of death, and that if there was any inherited taint which blighted the Berkowitz family, the findings upon this autopsy would enable them to take precautionary measures to protect the other members of the family. Under no circumstances, gentlemen, are you permitted to infer, even to a remote degree, that Mrs. Berkowitz did exhibit such symptoms or that this defendant had had any hand in causing Mrs. Berkowitz's death. You do not have any right even to suspect that such was the case. It is averred that he later said he would consent to an autopsy. The only reason that this testimony was permitted to reach your ears was on the question of the defendant's conduct when the alleged request for the autopsy upon his wife's body was made."

True it is that the above-quoted admonition by the court was clearly phrased. We think, however, that the evidence of defendant's refusal to permit an autopsy upon the body of his wife, which came into the case in the manner described above, was not only of doubtful probative value as proof of the defend-

ant's consciousness of guilt but was prejudicial to the defendant's rights before the jury. The present case is one where circumstances incidental to the trial made the court's admonition " easy to give and hard to follow." (*People* v. *Robinson*, 273 N. Y. 438, 445–446.) In this instance the court's admonition came after there had been imbedded in the minds of the jury since the first day of the trial the suggestion that while the defendant and the decedent were living with her mother, her mother had died as the result of an illness in which she exhibited symptoms and forms of distress similar to those of which the decedent complained before her death. Although the court's admonition was clear it cannot be said, with the degree of assurance to be desired in so close a case, that it erased from the jurors' minds the words previously emphasized by the District Attorney in his summation — " They both cried, ' Don't touch my feet! '. They had identical symptoms." The implications to be drawn by the jury from that statement and manifestly intended were that while the defendant and the decedent were living with her mother, the mother had died of strychnine poisoning — the same death-dealing agency which the People charge was used by the defendant to exterminate his wife. As an accusatory statement, strongly suggestive of a criminal act by the defendant other than the one for which he was being tried, it was improper and prejudicial to his rights. (*People* v. *Loomis*, 178 N. Y. 400, 406; *People* v. *Buffom*, 214 N. Y. 53, 58–61; *Boyd* v. *United States*, 142 U. S. 450, 458; and see Warren on Homicide, § 213.) In the present case where, as we have seen, the judgment of conviction rests upon the jury's choice between conflicting views of qualified experts on a decisive issue of fact, the statement of the District Attorney in his summation may have been " * * * sufficient to resolve against [the defendant] any reasonable doubt that might previously have been entertained as to his guilt." (*People* v. *Loomis, supra,* p. 406.)

These considerations, standing alone, have exerted strong influence upon our judgment that justice to the defendant's rights requires a new trial. They are reinforced, however, by another incident at the trial which becomes decisive in its cumulative weight. One of the fundamental statutory rights accorded to the defendant is that he " is presumed to be innocent, until

the contrary be proved; and in case of reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal." (Code Crim. Pro., § 389.) When the trial judge reached that point in his charge where he defined what was intended by the Legislature's use of the phrase " reasonable doubt " he said — " It is not a doubt based upon sympathy or a whim or prejudice or bias or a caprice, or a sentimentality, or upon a reluctance of a weak-kneed, timid, jellyfish of a juror who is seeking to avoid the performance of a disagreeable duty, namely, to convict another human being of the commission of a serious crime."

While no judge is to be confined to the use of any precise verbiage, it is our thought that to define reasonable doubt by use of such characterization was not conducive to a fair and impartial consideration of the evidence.

The judgment of conviction should be reversed and a new trial ordered.

DESMOND, J. (dissenting).    The majority opinion is for reversal, on these grounds:

1. That it was prejudicial error to permit Mrs. Kushner, sister of the deceased, to testify to a conversation wherein Mrs. Kushner urged defendant to permit an autopsy and wherein Mrs. Kushner mentioned to defendant that Mrs. Berkowitz, the mother of the witness and of deceased, had exhibited before her death some of the same symptoms as deceased.

2. That this alleged error was not cured by the court's instructions to the jury that the jurors were not to infer, or suspect from the testimony above referred to, that defendant " had any hand in causing Mrs. Berkowitz's death ".

3. That this alleged error was the more serious and requires a reversal here, because, we are told, the central fact issue in the case — as to whether deceased died from strychnine taken at the hospital an hour and a half before her death or at her home thirty hours before her death — had to be decided by the jury merely on a choice between the conflicting views of two sets of qualified experts.

4. That certain language in the court's charge as to reasonable doubt was susceptible of implications unfavorable to defendant's position.

We cannot agree to any of those four propositions.  In our view, no error was committed on the trial and the jury's verdict

stands on evidence strong enough and convincing enough to leave the jurors without any reasonable doubt of defendant's guilt.

1. The conversation between Mrs. Kushner and defendant on the day after the funeral, testified to by the former, is quoted in Judge LEWIS' opinion. In that conversation Mrs. Kushner did not accuse defendant of responsibility for the death of her sister or of her mother. She asked defendant to permit an autopsy so that the family, bereaved by the two deaths, might " find out " their cause. She pointed out to defendant that she (Mrs. Kushner) had two children of her own and that she did not want her two children " to be stricken that way ". The cause of death was not then known, as to either the mother or the daughter. The reference to the mother's symptoms, in this conversation, was a natural one, since it was the similarity of symptoms which troubled Mrs. Kushner and led her to desire further investigation into the two deaths. Defendant refused to consent to an autopsy. We do not understand that the majority is holding that it was error to receive the testimony as to that refusal. There is in the record other evidence, received without objection, given by the family physician that he, too, suggested to defendant, soon after the funeral, that the body be exhumed, for the same purpose.

It has always been held in this State that efforts to conceal a crime, or the evidence thereof, are " proper subjects of consideration, as indicative of a guilty mind, and in determining the question of the guilt or innocence of the person charged " (*People* v. *Place,* 157 N. Y. 584, 598; see *People* v. *Buchalter,* 289 N. Y. 181, 217). " It is to-day universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself " (2 Wigmore on Evidence [3d ed.], § 276). " Evidence of flight, concealment or analogous conduct is always admissible " (*People* v. *Reddy,* 261 N. Y. 479, 486). This is an application, perhaps, of the more general rule that " the demeanor of a prisoner at the time of his arrest, or soon after the commission of a crime, or upon being charged with the offense, is a proper subject of consideration in determining the question of guilt " (*Green-*

*field* v. *People,* 85 N. Y. 75, 86). Such evidence, like evidence of flight, is taken " upon the theory that the jury will give it such weight as it deserves, depending upon the surrounding circumstances " (*Ryan* v. *People,* 79 N. Y. 593, 601). The kinds of conduct properly suggesting consciousness of guilt are beyond enumeration, as Wigmore points out (Vol. II, [3d ed.], § 273 [1]). We think the refusal of a husband to heed the entreaties of his wife's sister — and the suggestion of the trusted family physician — that an autopsy be had to delve further into a mysterious death, is such conduct. In itself it does not establish guilt — there is much stronger proof here as we shall point out hereafter — but it is a circumstance from which the jurors could conclude that defendant was trying to prevent a scientific investigation of his wife's death. The jurors might be satisfied with the husband's explanation for his refusal, as given to the family physician: that he had religious scruples against exhumation. They might, on the other hand, decide that it was a case of " The wicked flee when no man pursueth ", or they might attach to the incident no importance whatever. It was for them to say.

If, then, it was proper to let the jury hear about defendant's rejection of the suggestion, it was right and fair that they should hear the whole of the conversation between defendant and his sister-in-law. Her statement of her reasons for wanting a post-mortem examination might be important to the jury in judging the significance of defendant's refusal to permit it. Such a demand, if made without any show of reason, might well be ignored by a husband. But Mrs. Kushner's reasons were weighty ones — or so the jury might think — and the husband's spurning of so moving a supplication might be meaningful to a jury. The jury was entitled to hear the whole of the conversation and the reception of the whole thereof was not erroneous merely because it might start the jury thinking about another possible crime (see *People* v. *Buchalter, supra,* 289 N. Y. at pp. 217, 218).

As Judge Lewis points out, the District Attorney in his summation quoted to the jury the testimony of Mrs. Kushner, including the reference to the mother's symptoms, and also reminded the jury that Dr. Ginsberg, too, had suggested a post-mortem examination. The District Attorney then argued to the jury

that the defendant's refusals amounted to concealment. We think that was fair argument. We have examined with care the several paragraphs of the prosecutor's summation in which he discusses, and argues from, defendant's answers to the proposals that the body be disinterred. We find nowhere in that summing-up speech, any suggestion, open or covert, that defendant was involved in the mother's death also.

2. If there was any error in the admission of the proof of that conversation or in letting the District Attorney discuss it in summation, the error was cured by the trial judge's clear and positive instructions to the jury, as quoted in Judge Lewis' opinion. In plainest language the County Judge told the jurors, just before they retired to deliberate, that they must not infer or suspect that defendant had anything to do with the death of his mother-in-law. We are in duty bound to presume that those instructions effaced all prejudice (*People* v. *Barnes,* 202 N. Y. 77, 78; *People* v. *Pacelli,* 251 N. Y. 66, 67).

3. We are told that the prejudicial references to the mother-in-law's death symptoms were all the more unfair to this defendant since this, so it is said, was a close case where the jury had to settle the principal issue of fact by balancing, one against the other, the more or less equally strong, but directly contradictory, opinions of the rival groups of experts. Surely it is not the law that experts always cancel each other out or that a defendant, merely by producing an expert to swear the other way, creates, as matter of law, a reasonable doubt of the validity of the opinion of the People's expert. Such cases as *People* v. *Harris* (136 N. Y. 423), *People* v. *Buchanan* (145 N. Y. 1), and many others, show that it is for the jury to resolve such disputes and decide where the truth lies (see *People* v. *Place,* 157 N. Y. 584, 594). It was, of course, essential here that the People prove beyond a reasonable doubt that Mrs. Feldman died from strychnine administered to her at the hospital. That a massive dose of strychnine killed her was established by the post-mortem findings (an autopsy was finally had pursuant to a court order). Unquestionably she had ingested some quantity of that drug at her home, thirty hours before her death. If that was the lethal draught, defendant could not be convicted here. It had to be shown that the fatal dose was swallowed at the hospital and **that defendant was responsible for the presence of the**

strychnine in that dose. With his own hands he had filled the six bottles of prescribed medicine, so, if the poison was in one of those bottles, defendant put it there. What was left to prove was that the wife died from drinking the bottle of medicine which the nurse gave her at 2:30 A.M. on the morning of December 9th, a half hour before her fingers flexed, her body discolored and there began the final convulsions that continued until her death at 4:00 o'clock. Before the nurse furnished that dose, Mrs. Feldman had showed signs of improvement and approaching recovery. If that last attack resulted from the medicine taken just before the onset of the attack, then, in all human probability, defendant was guilty of murder by poisoning. Three experienced, thoroughly qualified specialists testified for the People. Answering the same hypothetical question, each told the jury, flatly and positively, that the woman could not have lived for thirty hours with 3.7 grains of strychnine in her body. (One grain is fatal, it is agreed.) The fatal ingestion, they insisted, must have been at the hospital. They were certain that such a quantity of the poison would kill within a period of ten minutes to an hour. From the established facts, as related to them, they concluded that the poison was in the second bottle of medicine. The defense called two expert witnesses. Neither of them met the People's proof head on. Neither gave testimony nearly as strong or positive as that of the People's experts. Dr. Danzer, for defendant, would go no further than to say that death, under the circumstances, "might have" or "could have" resulted from strychnine taken before Mrs. Feldman went to the hospital. He pointed out that total elimination of strychnine from the system, by nature's own methods, sometimes takes two or three days. He knew of cases where patients, having taken deadly doses of strychnine, lived for thirty-six hours afterward. Dr. Danzer did not say that he ever heard of a person living for thirty hours, or any other period, after taking 3.7 grains of strychnine. His opinion seemed to be that the other medicines (all nonpoisonous), given Mrs. Feldman at the hospital, necessarily retarded the action of the strychnine so that a day and a half elapsed before the woman died of the poison. To conclude from such theorizing that the poison was taken before admission to the hospital would be to conclude that no quantity of the drug, however great, could

produce death in less than thirty to thirty-six hours. The witness did not go that far and the jury would not have been bound to go that far with him. The People's witnesses were certain that 3.7 grains of strychnine would bring death in an hour or less. Dr. Danzer did not directly dispute that. His opinion was that, ordinarily, treatment such as Mrs. Feldman had at the hospital would slow up the fatal processes and keep the patient alive for twenty-eight hours or more. Defendant's other expert, Dr. Melinos, was even less helpful to defendant's cause. On cross-examination he admitted that it was "improbable" that the woman could have lived twenty-eight hours with 3.7 grains of strychnine in her system. The jurors were justified in accepting the clear, strong statements of the People's technical witnesses, statements not broken down on cross-examination and not directly disputed by Dr. Danzer or Dr. Melinos.

The People had to prove that the poison was in the second bottle. We think the People proved that, to the hilt. But there was much other proof against defendant. Since this is a dissenting opinion, we will not analyze those corroborations but merely list them: defendant's greed for money, his attentions to another woman, his disparaging remarks about his wife (see *People* v. *Benham,* 160 N. Y. 402), his false statements when questioned by the police and by the prosecutor. Those items form a background for the undisputed showing that Mrs. Feldman died from a triple-strength, fatal draught of strychnine, and for the strong evidence, above described, that the baneful substance came from a bottle which had been filled by defendant as he stood at his prescription counter, with strychnine right at hand and no one there to watch what he did. Of course all that was not direct but circumstantial evidence, but such is the only kind of proof available against secret poisoners (see *People* v. *Harris* and *People* v. *Buchanan, supra; People* v. *Benham, supra*). And it was circumstantial evidence of such quality and quantity as to be "the higher form of evidence" (*People* v. *Place, supra,* 157 N. Y. at p. 594; see *People* v. *DeMartini,* 218 N. Y. 561, 566).

4. The County Judge, in his charge, told the jury that a reasonable doubt was not one based "upon a reluctance of a weak-kneed, timid, jellyfish of a juror who is seeking to avoid the performance of a disagreeable duty * * * ". That was, of

course, rather a free translation of the language of *People* v. *Barker* (153 N. Y. 111, 115): "nor is it a mere subterfuge to which resort may be had in order to avoid doing a disagreeable thing". The County Judge's language here was racier and more colorful, but it meant the same thing. Whether the phrasing was fortunate or not, the idea was the thing and "there is no rigid rule as to the manner of doing it" (*People* v. *Hughes,* 137 N. Y. 29, 40). This was a long and thorough trial. We should not lightly assume that the jurors were so weak of will and judgment as to let their verdict in a capital case be influenced by a single lurid phrase.

The judgment of conviction should be affirmed.

LOUGHRAN, Ch. J., CONWAY, DYE and FULD, JJ., concur with LEWIS, J.; DESMOND, J., dissents in opinion in which THACHER, J., concurs.

Judgment of conviction reversed, etc.